**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Cordell L. TILLMAN, Defendant–
Appellant.**

No. 91–5984.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 14, 1992.

Decided May 6, 1992.

Rehearing Denied July 16, 1992.

Louis DeFalaise, U.S. Atty., Office of the U.S. Atty., Lexington, Ky. and Jacquelyn A. Jess, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Covington, Ky., for plaintiff-appellee.

Martin S. Pinales (briefed) and Edmund McKenna (argued), Sirkin, Pinales, Mezibov & Schwartz, Cincinnati, Ohio, for defendant-appellant.

Before: KEITH and MARTIN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

Defendant, Cordell L. Tillman, was indicted in the United States District Court for the Eastern District of Kentucky on three counts [1]. In Count One, defendant was charged with violating 21 U.S.C. § 846, Conspiracy to Possess with Intent to Distribute Cocaine; Count Two charged defendant with violating 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, Aiding and Abetting the Possession with Intent to Distribute Cocaine; Count Three charged defendant with violating 18 U.S.C. § 1952(a)(3) and 18 U.S.C. § 2, Aiding and Abetting the Travel in Interstate Commerce with Intent to Promote Unlawful Activities. Defendant filed a Motion to Suppress Tangible Evidence and Statements. A hearing on the motion

---

**1.** Defendant was indicted with two co-defendants, however, they are not parties to the present appeal.

to suppress was held before a magistrate. The Magistrate issued his report recommending the motion to suppress be denied. Defendant thereupon filed his objections to the Magistrate's report. On April 30, 1991, the District Court overruled defendant's objections and denied defendant's motion to suppress. Defendant then entered a conditional plea of guilty pursuant to Fed. R.Crim.P. 11(a)(2) to Count Three of the indictment thereby preserving his right to appeal the denial of his motion to suppress evidence. Counts One and Two were dropped. On July 8, 1991, defendant was sentenced to thirty-seven months imprisonment, three years supervised release and a $50.00 special assessment. Defendant filed a timely Notice of Appeal. For the following reasons the decision of the district court is vacated and the case is remanded.

## I.

On August 1, 1990, defendant was a passenger on Delta Airlines Flight 1018 from Norfolk, Virginia to Cincinnati, Ohio. Accompanying defendant on the flight was Rodney Rogers a.k.a. Kaseem Courtney Sanders. Upon their arrival at the Cincinnati Airport, defendant and Rogers were being investigated by Officer David W. Bunning of the Airport Police Department. Officer Bunning became interested in the two men after overhearing a third person, Thomas Vines, asking a Delta Airlines ticket agent whether Rogers was on Flight 1018. Officer Bunning had recognized Vines as a known felon with a long criminal history.

Officer Bunning had personally been involved in cases in which Vines was a participant. In November, 1989, Officer Bunning was present during a seizure of $24,990.00 in cash at the airport. Shortly afterwards Vines appeared at the airport attempting to retrieve the money. The money, however, has since been forfeited as drug proceeds. Officer Bunning noticed that Vines wore a large diamond and gold ring with the nickname "Buddy" engraved on it. Again in April, 1990, Officer Bunning was involved in a seizure of cash suspected of being derived from drug pro-

ceeds involving Vines. This time the amount was over $27,215.00. Officer Bunning once again noted Vines' distinctive ring. Finally, in July, 1990, Officer Bunning learned Vines was being sought by the New York City Police Department in connection with a murder investigation and there was an outstanding arrest warrant for Vines for failure to appear for sentencing on a drug trafficking charge. The description given Bunning by the New York police included the distinctive ring.

So it was that when Officer Bunning spotted Vines at the airport in August, 1990, he was able to identify Vines by his appearance and his ring. Moreover, given Officer Bunning's knowledge of Vines criminal history, it would have been an abdication of Bunning's duty not to observe Vines' actions. Officer Bunning spoke to the Delta ticket agent and determined that Rogers was traveling with defendant. The pair had purchased first class tickets that day, paid for the tickets with cash, and listed the same home address in Cincinnati. Officer Bunning decided to wait for the plane to arrive and observe the people exiting the aircraft. He surmised that because the pair was in first class they would be the first people off of the plane. He also relayed the information to other airport officers. Officers Gayle Blackburn and Kerry Curry, also of the Cincinnati Airport Police went to the baggage claim area in search of Vines. Agent Wes Sullivan, of the Drug Enforcement Agency went to search the concourse area.

Defendant and Rogers were observed by Bunning debarking from the plane. As the pair approached the concourse they were speaking to each other. When they reached the airport concourse, the pair split up. Rogers was carrying a Gucci bag while defendant carried a gray nylon folding bag. Rogers made a pay telephone call as defendant proceeded to the baggage claim area. Officer Bunning followed Rogers while Officer Sullivan followed defendant. Rogers and defendant met again at the baggage claim area. Rogers had already claimed their baggage which consisted of a large "Puma" bag and a smaller

black nylon bag. The two then exited the airport building with their luggage.

As Officer Bunning followed the pair out of the building, he learned that Vines had been taken into custody. He approached defendant and Rogers on the sidewalk outside the airport and asked them for identification. Defendant gave him a Virginia driver's license and explained he was in town to visit someone named Buddy. Rogers produced a Virginia license in the name of Kaseem Sanders and said he was in town to pay a traffic ticket which, in fact, he produced and showed to the officers. Officer Bunning then informed the pair that he and Officer Sullivan were narcotics investigators and asked them if they would consent to a search of their bags. Officer Bunning testified that both men gave their consent at that time. They were then given the option to go into a private room or have the search conducted on the sidewalk. Both men opted to go into a private area.

The four men proceeded to the First Aid Room, however, it was already occupied by Lts. Blackburn and Curry who had Vines with them. The room was relatively small and not large enough for all of them to fit inside. Therefore, Agent Sullivan was forced to remain outside the room where he would conduct a search of the black nylon bag. The door to the First Aid Room was then closed. As Officer Bunning began to search the Gucci bag, Rogers revoked his consent to search and inquired where the black nylon bag was. Officer Bunning stopped his search and closed the bag. Agent Sullivan was told to halt his search of the black nylon bag. Up to that point in time nothing inside any of the bags had been seen by any of the officers.

Vines was then told he was being arrested on an outstanding warrant and taken away by Officer Blackburn. The officers informed defendant and Rogers that the police would attempt to obtain a search warrant for their bags. In the meantime, the two suspects were told they were not free to leave. Rogers inquired as to how long it would take to obtain a warrant, to which Bunning responded that it would take about two to three hours. Rogers stated that if it would take that long then he would consent to the search.

Officer Sullivan inquired as to the ownership of a large black bag. Rogers stated that although he had packed it, the bag actually belonged to defendant. Agent Sullivan asked defendant if he had any objections to the bag being searched. Defendant shook his head in the negative. Defendant had his head bent over and was looking at the floor. Officer Bunning knelt down placing his face under defendant's in order to make eye contact with defendant and again asked for his consent to search. Defendant verbally responded that they could go ahead and search.

The officers found a package containing one kilogram of cocaine inside the black bag. Rogers and defendant were arrested and given a shortened version of their Miranda warnings. Defendant then stated the bag containing the cocaine belonged to him. Rogers confirmed this information and retracted his previous statement that he had packed the bag's contents.

## II.

■ Defendant contends his statements made to the police subsequent to his arrest were given in violation of his fifth amendment rights because the *Miranda* warnings read to him were inadequate. Officer Sullivan testified at trial that he gave the following warnings to both defendant and Sanders a.k.a. Rogers:

> They had the right to remain silent, the right to the presence of an attorney if they so wish, they are not required to answer any questions and if they decide to answer questions they can stop and do so, and if they cannot afford an attorney one will be appointed before they answer any questions.

Defendant argues that he was never told that any statements he might make could be used against him. He further argues that he was not informed he was entitled to an attorney *during* questioning in addition to before questioning. Therefore, defendant argues the District Court erred by not suppressing the statements he made subsequent to his arrest.

The United States Supreme Court has recently held as follows:

> We have never insisted that *Miranda* warnings be given in the exact form described in that decision. In *Miranda* itself, the Court said that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent,* prerequisites to the admissibility of any statement made by a defendant." [*Miranda v. Arizona* ], 384 U.S. [436], at 476 [86 S.Ct. 1602 at 1629, 16 L.Ed.2d 694 (1966) ] (emphasis added). See also *Rhode Island v. Innis,* 446 U.S. 291, 297 [100 S.Ct. 1682, 1688, 64 L.Ed.2d 297] (1980) (referring to "the now familiar *Miranda* warnings ... or their equivalent"). In *California v. Prysock,* 453 U.S. 355 [101 S.Ct. 2806, 69 L.Ed.2d 696] (1981) (per curiam), we stated that "the 'rigidity' of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant," and that "no talismanic incantation [is] required to satisfy its strictures." *Id.,* at 359 [101 S.Ct. at 2809].
>
> ... The prophylactic *Miranda* warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker,* 417 U.S. 433, 444 [94 S.Ct. 2357, 2364, 41 L.Ed.2d 182] (1974). Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda.*" *Prysock, supra,* 453 U.S. at 361 [101 S.Ct. at 2810].

*Duckworth v. Egan,* 492 U.S. 195, 202–3, 109 S.Ct. 2875, 2879–80, 106 L.Ed.2d 166 (1988) (emphasis in original) (footnote omitted).

In *Duckworth,* the police told the defendant he would be supplied an attorney if and when he went to court. The Supreme Court held that this was sufficient since defendant knew he had a right to counsel. Furthermore, the warning complied with the appointment of counsel procedures under Indiana law.

The case at bar poses a much more troublesome deviation from the traditional warnings which most police read from a prepared card. Defendant was never told any statements that he would make could be used against him. Of all of the elements provided for in *Miranda,* this element is perhaps the most critical because it lies at the heart of the need to protect a citizen's Fifth Amendment rights. The underlying rationale for the *Miranda* warnings is to protect people from being coerced or forced into making self-incriminating statements by the government. By omitting this essential element from the *Miranda* warnings a person may not realize why the right to remain silent is so critical. Although we as judges and lawyers may be aware of the link between these elements we can not be so presumptuous as to think that it would be common knowledge to laymen. It would clearly be unreasonable to say defendant was somehow informed of this right. He was informed he did not have to say anything to the police, but, was never told that any statements he might make could be used against him. This is a dangerous omission because a person under arrest would feel more compelled to answer questions of police officers. In addition, the police failed to convey to defendant that he had the right to an attorney both before, during and after questioning.

Although there is no mandate that "magic words" be used, there is a requirement that all elements of Miranda be conveyed. This was not done here. The officers failed to convey the substance of defendant's rights under law. Since this was not done in this case, the District Court erred by denying defendant's motion to suppress statements. This court also takes note of the Ninth Circuit's decision in *United States v. Noti,* 731 F.2d 610 (9th Cir.1984), in which the court noted that although there was no requirement for police to read the *Miranda* rights from a prepared card, such a practice should be encouraged. We join with the Ninth Circuit in recommending such an approach as this reduces the chances for error, assists a police officer in

the performance of his duties, and protects the rights of innocent citizens as well as those accused.

Since defendant was not properly given his *Miranda* warnings, the statements made by him subsequent to his arrest must be suppressed.

### III.

■ Defendant next contends the initial stop by the police in the airport was an unlawful seizure of his person and therefore violative of the fourth amendment. Defendant argues there was no valid articulate reason for stopping defendant, hence, all evidence acquired as the fruit of this stop must be suppressed. Defendant maintains the main reason he was identified for observation was his status as an African–American.

The United States Supreme Court has recently held as follows:

Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as reasonable person would feel free "to disregard the police and go about his business," *California v. Hodari D.*, 499 U.S. ——, ——, 113 L.Ed.2d 690, 111 S.Ct. 1547 (1991), the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 20 L.Ed.2d 889, 88 S.Ct. 1868 [1879 n. 16] (1968): "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

Since *Terry* we have held repeatedly that mere police questioning does not constitute a seizure. In *Florida v. Royer*, 460 U.S. 491, 75 L.Ed.2d 229, 103 S.Ct. 1319 (1983) (plurality opinion), for example, we explained that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Id.*, at 497, 75 L.Ed.2d 229, 103 S.Ct. 1319 [at 1324]; see *Id.*, at 523, n. 3, 75 L.Ed.2d 229, 103 S.Ct. [at 1338] [n. 3] (Rehnquist, J., dissenting).

— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398.

Accordingly, in the instant case, the police officers had every right to approach defendant to ask him a few initial questions. Defendant's argument that they need at least a reasonable suspicion to even approach him is simply incorrect. The police must be able to approach the public at large in order to make reasonable inquiries. It would be a sorry state of affairs if police officers were prohibited from speaking with the general public. In addition, we should encourage our police to perform good police work which is what Officer Bunning did in his surveillance and initial investigation of defendant.

Defendant's claim that the initial contact was based on race poses a different issue. This argument is based upon defendant's rights guaranteed under the Equal Protection Clause of the Constitution. Defendant claims Officer Bunning followed defendant and Rogers because they were the first black men to exit the plane. In other words, defendant claims Officer Bunning used race to determine his suspects. This was based on an assumption that if Thomas Vines, a known criminal, was black, the men he was waiting for must also be African–American.

A review of the record, however, shows Officer Bunning was attempting to observe the two men associated with Vines. Bunning testified that he followed defendant and Rogers because they were the first two men to exit the aircraft. This led Officer Bunning to believe they were the two men flying in first class that Vines had inquired about. Although it is true that all three men, Vines, defendant and Rogers

are African–American, there is nothing in the record to substantiate defendant's claims that they were singled out because of race.

## IV.

Defendant contends the government failed to meet its burden of proving defendant voluntarily consented to the search of his luggage. Defendant argues that the testimony of the police officers could be construed as contradictory. Defendant further argues that even if the police officers testimony is not so construed, the circumstances surrounding the consent were contaminated by coercion and duress.

Consent must be proved by clear and positive testimony and must be unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion. *United States v. Williams,* 754 F.2d 672, 674–5 (6th Cir.1985). Moreover, in a warrantless search, the government bears the burden of proving consent. *United States v. Jones,* 846 F.2d 358, 360 (6th Cir.1989) (Per Curiam). In the case at bar, defendant gave the officers consent to search when he was first approached on the sidewalk. He was given the choice to move into a more private area which he opted for, however, he did not revoke his consent. Inside the First Aid Room, Rogers revoked his consent, yet defendant did not specifically revoke his consent. The officers nevertheless stopped the search. Apparently, they believed that defendant had joined in Rogers's revocation. At that point defendant was told if he did not consent he would have to wait there for two or three of hours while the officers attempted to gain a search warrant. Although the police told defendant he was not under arrest, he was also informed that he was not free to leave. Further, the police had arrested Vines in the presence of defendant and Rogers and taken him out of the room. Finally, the police testified defendant was looking down at the floor when Officer Bunning knelt down forcing defendant who had his hands on his knees to stare at Bunning's face.

Whether a consent is given voluntarily or is the product of duress or coercion either express or implied is a question of fact to be viewed by the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 233–34, 93 S.Ct. 2041, 2050–51, 36 L.Ed.2d 854 (1973); *Williams, supra.*

The findings of the district court with regard to the voluntariness of the consent will not be reversed unless clearly erroneous. *Jones,* 846 F.2d at 360. A finding by the district court is clearly erroneous when, although there is evidence to support it, the reviewing court, upon examination of the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citations omitted).

Based upon a review of the totality of the circumstances involved, it cannot be said that defendant voluntarily consented to the search. Defendant was told he was not free to leave. Although the government claims he was not under arrest, clearly when one is told he is not free to leave then one would perceive he is under arrest. Furthermore, the record discloses that defendant was told he would have to wait two to three hours, in a small room cramped with people, while the police attempted to get a search warrant. This court has held that a brief investigatory detention is permissible if supported by a reasonable and articulate suspicion of wrongdoing. *United States v. Williams,* 754 F.2d 672 (6th Cir.1985). However, a detention of two or three hours is more than a "brief" detention. The facts of the case do not demonstrate the police officers had probable cause to hold defendant for that length of time absent consent.

In *Williams,* this court cited a variety of factors in finding a voluntary consent. Among the factors is whether the defendant is threatened with detention should he refuse to consent. *Id.* at 675. The threatened detention in the case at bar taints the voluntariness of the consent. Defendant did voluntarily accompany the police to the

First Aid Room. This is similar to *Williams*, although this court in *Williams* noted that the defendant was always free to leave. *Id.* In addition, the First Aid Room should not have even been offered for use with so many people involved. The room involved in *Williams* contained only defendant and one police officer. The court relied on the fact there was only one police officer present as a factor in finding no coercion. *Id.* In the instant case the fact that not all the officers could even fit in the crowded room demonstrates the oppressive atmosphere. The case at bar can be further distinguished from *Williams*. In that case the defendant freely cooperated with the police in opening the luggage. In the case at bar, the police officer got down on his knees to force the defendant to look at him. The fact that the police gave defective Miranda warnings must also be considered. Based upon the facts, this court concludes that the district court was clearly erroneous when determining the consent was given free of coercion.

■ Finally, the government cannot rely on the fact that only Rogers revoked his consent. It is obvious from reading the record that the police were treating the pair as a single entity. This is demonstrated as noted previously by the police officers actions which manifested an understanding that the consent had been revoked. The officers did not appear to believe that both men needed to revoke their consent individually. To now hold otherwise would be to allow the police to mislead their suspects into giving up a substantial right. The ensuing consent must be considered invalidated because of the coercion and duress involved. Since the consent was invalid, the subsequent search was invalid all the evidence derived from the unlawful search must be suppressed.

### V.

The decision of the district court is VACATED and the case is hereby REMANDED for proceedings not inconsistent with this opinion.