983 F.2d 1069
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael A. ANDERSON, Defendant-Appellant.
 No. 92-3387.
 United States Court of Appeals, Sixth Circuit.
 Jan. 6, 1993.
 
 Before BOYCE F. MARTIN, JR. and MILBURN, Circuit Judges, and WELLFORD, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Michael Anderson appeals the judgment of conviction and sentence entered on his conditional guilty plea to possession with intent to distribute approximately twelve kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). On appeal, the issues are (1) whether the district court erred in refusing to grant defendant's motion to suppress evidence based on a finding that Drug Enforcement Agents had reasonable suspicion to detain defendant as permitted by the Fourth Amendment in order to obtain a search warrant for defendant's luggage, and (2) whether the district court erred in determining that defendant had given his consent to search his luggage. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 On January 27, 1992, Special Agent George A. Krebs of the Drug Enforcement Administration ("DEA") received a telephone call from Officer Jim Hughes of the Dallas, Texas, Police Department regarding defendant. Hughes related that on that same day, a drug detection canine had "alerted" on, that is, identified as containing the odor of drugs, two pieces of luggage bearing defendant's identification tags. Hughes gave Krebs a description of defendant and informed Krebs that defendant had boarded a flight to Cleveland, Ohio. Hughes also related to Krebs that an investigation had revealed that defendant had purchased his one-way ticket to Cleveland in Los Angeles, California, at 8:04 a.m. on that same morning by paying $570 in cash. The business telephone number listed on the ticket was a pager number. A second number obtained from defendant's luggage while it was in Dallas was no longer in service.
 
 
 3
 At approximately 6:15 p.m. on January 27, 1992, Krebs and Task Force Officer Deborah Harrison observed a black male fitting the description given by Hughes deplane flight number 310 from Dallas, Texas. The male, later identified as defendant, walked quickly through the concourse to the baggage claim area. Upon arriving there, he placed a call to a hotel in Beachwood, Ohio, and made a reservation for that evening and possibly for one more day, indicating that he would pay cash. Krebs, who stood at the telephone next to defendant, was able to overhear the conversation.
 
 
 4
 Prior to the arrival of the defendant's luggage at the baggage claim area, Krebs had a drug detection canine check defendant's luggage. The canine "alerted" on the luggage, indicating the odor of drugs. The dog's handler testified that this dog was certified by the United States Police Canine Association and that in the past two and one-half years, the dog had had a success rate of 90 to 95 percent in detecting marijuana, cocaine, heroin, and any derivative. In addition, Krebs testified that he noticed that the type of luggage used by defendant, a hard case Samsonite with a rubber seal around the edges, was the kind frequently used by drug couriers because they believe that the rubber seal makes the suitcase airtight and helps to keep dogs from discovering the odor of drugs.
 
 
 5
 After completing his call to the hotel, defendant claimed his two pieces of luggage from the carousel and began to leave the baggage claim area. At that time, Krebs approached defendant and identified himself, asking whether defendant would speak with him. Defendant agreed and a conversation ensued.
 
 
 6
 When asked where he was flying from, defendant stated Dallas/Fort Worth instead of Los Angeles, California. Krebs testified that Anderson appeared very nervous, was stammering, and refused to make eye contact with him. Krebs informed defendant that a drug detection dog had identified his luggage as containing the odor of drugs. When Krebs asked defendant to consent to a search of his luggage, Anderson responded, "[t]hese bags might not be mine." J.A. 59. Krebs immediately asked Anderson if he were saying these bags were not his, and Anderson gave no response. Krebs testified that he asked defendant again if he would consent to a search, and defendant responded that he did not know what to do. Krebs told defendant that he did not have to consent to a search, but that if he did not consent, Krebs would need to get a search warrant, and defendant would be detained in the meantime. Krebs asked Anderson to accompany him to an office in the terminal.
 
 
 7
 Krebs and Harrison took defendant to the airport police office. While Krebs left the room and began to prepare an affidavit to obtain a search warrant, apparently two or three other officers involved in the investigation walked in and out of the police office at various times. It appeared there was at least minimal conversation between the officers and defendant, wherein he was asked again whether he would consent to a search of his luggage.[1] Defendant testified that he was told "it would be easier on me and make me look good" if defendant would consent to the search. J.A. 140. Defendant also testified that he was told he did not have to consent but that "they will just get a search warrant anyway." J.A. 141.
 
 
 8
 At some point, defendant asked if there was any difference between his consenting to a search or the search being conducted pursuant to a warrant. According to Krebs' testimony, he told defendant again that he did not have to consent whereupon defendant bent over and opened a piece of luggage. The district court found that after asking what was the difference between a warrant and consent, "without waiting for a response, defendant simply bent over and opened one piece of luggage." J.A. 9. He subsequently gave the combination to the other piece of luggage to Special Agent Bowie who opened it.
 
 
 9
 Bowie searched the two pieces of luggage and found twelve gift-wrapped packages which contained a total of 13.8 kilograms of cocaine. Defendant then signed a consent form and was thereupon arrested and advised of his Miranda rights. The district court found that defendant had been detained for less than one hour from the time he was initially stopped to the time he consented to the search, that he was 35 years old, and had one year of college education. The district court also found that defendant was told "several times" that he did not have to consent to a search and that there was no evidence of physical coercion or any deprivation of food or sleep.
 
 B.
 
 10
 On February 5, 1992, defendant was indicted by a federal grand jury under 21 U.S.C. § 481(a)(1) for possession with intent to distribute a controlled substance. After a suppression hearing on March 25, 1992, the district court denied defendant's motion to suppress evidence. Defendant entered a conditional plea of guilty under Federal Rule of Criminal Procedure 11(a)(2) on April 16, 1992, and was sentenced to 120 months incarceration followed by 4 years of supervised release. This timely appeal followed.
 
 II.
 A.
 
 11
 The district court found that there was reasonable suspicion of criminal activity because drug detection dogs in both Dallas, Texas, and Cleveland, Ohio, "alerted" on defendant's luggage indicating the presence of drugs. The district court further held that defendant gave his nonverbal consent to search the luggage by bending over to open one of the suitcases in the presence of the DEA agents and by subsequently giving the combination to the other suitcase to Special Agent Bowie.
 
 
 12
 A seizure as defined under the Fourth Amendment does not occur where law enforcement officers merely approach an individual in a public place and ask if he is willing to answer some questions or by putting questions to the individual if that person is willing to listen. Florida v. Royer, 460 U.S. 491, 497 (1983); United States v. Mendenhall, 446 U.S. 544, 555 (1980). No seizure occurred where Krebs simply identified himself to defendant, and defendant agreed to talk with Krebs. However, as defendant argues, at some point this consensual agreement to a conversation with the agent became a seizure as defined under the Fourth Amendment. A seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Michigan v. Chesternut, 486 U.S. 567, 573 (1988) (quoting Mendenhall, 446 U.S. at 554). In this case, a seizure took place when Agent Krebs asked Anderson to accompany him to the police office in the terminal in order that a search warrant could be obtained.
 
 
 13
 It is well settled that police officers may detain a person temporarily for investigative purposes where, considering the totality of the circumstances, the officers have a reasonable and objective basis for suspecting that that person is engaged in criminal activity. Terry v. Ohio, 392 U.S. 1, 21-22 (1968); United States v. Cortez, 449 U.S. 411, 418 (1981). Defendant argues that there was no reasonable or objective basis for believing that he was involved in criminal activity, and thus the agent's detainment was illegal. Where detainment is in violation of the Fourth Amendment, evidence seized during that detainment is inadmissible at trial. Royer, 460 U.S. at 507-508; see also Florida v. Rodriguez, 469 U.S. 1, 6 (1984).
 
 
 14
 Defendant asserts that the agents decided to detain him because he fit a drug courier profile and that such a profile does not by itself give rise to a reasonable and articulable suspicion of criminal activity. Defendant relies on Brown v. Texas, 443 U.S. 47 (1979), and Reid v. Georgia, 448 U.S. 438 (1980) (per curiam), to support his position. In Brown, the defendant was detained on the following grounds: (1) he was walking in an area which had a high incidence of drug trafficking, (2) he looked suspicious; and (3) he had not been seen in that area previously by the officers. In Reid, the officers detained the defendant because (1) defendant had arrived from Fort Lauderdale, a source city for cocaine; (2) defendant arrived in the early morning when law enforcement activity is diminished; (3) defendant and his companion seemed to be trying to conceal the fact that they were traveling together; and (4) the two of them had no luggage other than their shoulder bags. In both cases, the Supreme Court held that these facts did not justify even a temporary detainment. Reid, 448 U.S. at 440-41; Brown, 443 U.S. at 51-52.
 
 
 15
 However, there were a number of factors not present in Brown or Reid which the agents relied upon in this case in making their investigatory stop of the defendant. These facts include: (1) the defendant was flying from Los Angeles, a known source city of narcotics; (2) defendant's reservations had been made on the same day as his flight from Los Angeles, and he paid $570 in cash for his one-way ticket to Cleveland; (3) the telephone number listed as a business number by the defendant was a number to a pager and a second telephone number obtained from defendant's luggage was no longer in service; (4) the suitcases used by the defendant possessed a rubber seal around the edges which was consistent with suitcases used by drug couriers; (5) upon arrival at Cleveland Hopkins Airport, defendant made a hotel reservation for one or two days to be paid for with cash; (6) defendant told the agent he had flown from Dallas/Fort Worth when he had actually flown from Los Angeles; (7) defendant was nervous, stammered, and refused to make eye contact with Agent Krebs when initially questioned by Agent Krebs; (8) defendant initially responded that "these bags might not be mine" when asked by Krebs if he could look into his luggage; and (9) most significantly, two drug detection dogs had positively "alerted" on the defendant's luggage indicating the presence of illegal drugs.
 
 
 16
 These facts taken together as a whole provide more than sufficient evidence to constitute reasonable suspicion to justify a temporary detention. See United States v. Sokolow, 490 U.S. 1, 8-9, 109 S.Ct. 1581, 1586 (1989) (reasonable suspicion existed to detain defendant where defendant (1) paid $2,100 in cash for two airplane tickets from a roll of $20 bills containing nearly twice that amount in cash, (2) the agents had a reasonable ground to believe that defendant was traveling under an alias, and (3) defendant traveled 20 hours from Honolulu to Miami only to stay 48 hours). See also Royer, 460 U.S. at 506 (a positive result by a drug detecting canine would have resulted in defendant's justifiable arrest on probable cause); United States v. Knox, 839 F.2d 285, 294 n. 4 (6th Cir.1988) ("under Royer, the positive reaction of the Narcotics Unit dog alone would have established probable cause to not only search defendants' luggage, but to arrest them immediately"), cert. denied, 490 U.S. 1019 (1989).
 
 
 17
 In the alternative, defendant argues that even if the initial detention was within constitutional boundaries, the length of the detention exceeded permissible limits for an investigatory stop. As the Supreme Court stated in Royer,
 
 
 18
 an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.
 
 
 19
 460 U.S. at 500. See also Knox, 839 F.2d at 290.
 
 
 20
 In Royer, the defendant was observed by two plainclothes detectives at the Miami International Airport. After observing the defendant, the detective determined that Royer's appearance, mannerisms, and luggage fit the description of a drug courier profile. The defendant also purchased a one-way ticket under an assumed name and checked his two suitcases before going to the boarding area. Upon request of narcotics investigators, the defendant produced his airline ticket and driver's license. The detectives did not return his airline ticket and identification but asked the defendant to accompany them to a room approximately forty feet away which he did. Without the defendant's permission, one of the detectives retrieved the defendant's luggage and brought it to the room where they asked if he would consent to a search of his suitcases. Without orally responding, the defendant produced a key and unlocked one of the suitcases which was then opened by a detective. The defendant stated that he did not know the combination lock to the second suitcase, and when asked if he objected to the detective's opening the second suitcase, the defendant stated, "no, go ahead." Id. at 494. The search revealed marijuana, and the defendant was immediately arrested. Approximately fifteen minutes elapsed from the time the detectives approached respondent until his arrest.
 
 
 21
 The Supreme Court in Royer stated that detentions may be "investigative" yet still violate the Fourth Amendment absent probable cause and that law enforcement officers may not seek to confirm their suspicions by means that approach the conditions of an arrest. Id. at 499. Stated another way, "reasonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative." Id.
 
 
 22
 The Supreme Court held that once the detectives asked for and examined the defendant's airline ticket and driver's license, identified themselves as narcotics agents, told the defendant that he was suspected of transporting narcotics, and asked him to accompany them to the police room without returning his ticket or driver's license, and without indicating that he was free to depart, the defendant was seized for purposes of the Fourth Amendment. Id. at 502-503. The Court also held that while there existed a reasonable, articulable suspicion to justify a temporary, Terry-type detention, id. at 502, the detention exceeded permissible limits based on the facts of that case. Id. at 506.
 
 
 23
 The Court focused on several factors in reaching this conclusion. First, the officers failed to return defendant's ticket and driver's license and to inform him that he was free to leave if he desired. Second, the Court also found it significant that there was no evidence on the record which would "support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing Royer to the police room prior to the officers attempt to gain his consent to a search of his luggage." Id. at 505. The Court noted that had the detectives asked and the defendant consented to the search of his luggage out on the concourse, then the evidence from the search would have been admissible. Id. Third, the Court felt that the officers did not consider whether there were means by which a more expeditious investigation of the contents of Royer's luggage might be made. Id. The Court specifically noted that trained dogs are used to detect the presence of drugs in luggage. Id. The Court further stated that "[a] negative result would have freed Royer in short order; a positive result would have resulted in his justifiable arrest on probable cause." (Emphasis added.) 460 U.S. at 506.
 
 
 24
 The present case is distinguishable from Royer in several significant ways. First, the officers did return defendant's ticket and driver's license. Second, Krebs did request that defendant consent to a search of his luggage in the baggage claim area; however, defendant did not consent, stating that "this bag might not be mine." This response required the officers to detain defendant long enough to attempt to obtain a search warrant. Third, not one, but two drug detection dogs had "alerted" on defendant's luggage indicating the presence of drugs. Thus, according to Royer, not only did the officers in this case have reasonable suspicion to detain defendant for the time necessary to obtain a search warrant, they also had probable cause to arrest defendant. See also Knox, 839 F.2d at 294 n. 4. Therefore, based on the facts in this case, the detention of defendant in the police office for approximately one hour was "strictly tied to and justified by the circumstances which rendered its initiation permissible." Royer, 460 U.S. at 500 (citations omitted). Thus, defendant's detention was not unreasonable and did not violate Fourth Amendment guarantees.
 
 B.
 
 25
 To establish consent, the government must prove by clear and positive testimony that the consent was unequivocally, specifically, and intelligently given and "uncontaminated by any duress and coercion." United States v. Tillman, 963 F.2d 137, 143 (6th Cir.1992); see Schneckloth v. Bustamonte, 412 U.S. 218, 222-23 (1973). Furthermore, the government bears the burden of proving consent where the search is warrantless. Tillman, 963 F.2d at 143. Whether consent to a search is voluntary or made under duress or coercion is a question of fact to be considered under the totality of the circumstances. Schneckloth, 412 U.S. at 233-34. Thus, the district court's determination of fact that consent was given voluntarily will not be reversed unless clearly erroneous. Tillman, 963 F.2d at 143.
 
 
 26
 Defendant argues that the agents coerced him into consenting to the search of his luggage by threatening to obtain a search warrant if he did not agree to the search. In support of this argument, defendant relies on United States v. Boukater, 409 F.2d 537 (5th Cir.1969). In Boukater, federal officers approached the defendant at the Miami International Airport, identified themselves, and told the defendant he was suspected of carrying counterfeit bills. The officers informed the defendant he was not under arrest and could leave if he wished. The defendant said he wanted to find out "what was going on." Id. at 538. The officers then asked if he would consent to a search of his bags. The defendant responded, "it looks like you got me. You can search my bags." Id. The officers then asked him if he would sign a consent form which he refused to do. After he refused to sign, one of the officers said something to the defendant about obtaining a search warrant. Defendant then orally agreed again to consent to a search. A search of his bags revealed counterfeit bills. The Fifth Circuit stated that
 
 
 27
 [t]he statement by Rivers [the officer] about procuring a search warrant is more troublesome and might lead us to a different result if the evidence indicated that Boukater was in custody and that the agent either said or implied that he might as well consent because a warrant could be quickly obtained if he refused.
 
 
 28
 Id. at 538. However, the court determined that because the defendant had been advised he was not under arrest and was free to leave and because defendant confessed his guilt and gave his consent to search before they asked him to sign a waiver, the court found that the consent was not coerced. Id. at 538-39.
 
 
 29
 In this case, defendant testified at the suppression hearing that the agents told him he might as well consent to the search of his luggage because they were going to get a search warrant anyway. The district court's opinion reveals only that Agent Krebs simply informed defendant of the reason why his detention would be necessary when the defendant did not give consent to search his luggage. Furthermore, as previously discussed, under the circumstances of this case, defendant's detention at the police office in the airport was within appropriate Terry stop boundaries, and more importantly, the police officers possessed probable cause to arrest defendant. Cf. Tillman, 963 F.2d at 143 (where police threatened to detain the defendant for two to three hours to obtain a search warrant unless he consented and no probable cause existed to detain the defendant for that length of time, defendant's consent was coerced).
 
 
 30
 In addition, there are several other factors which contribute to a finding that defendant's consent was voluntarily given. The district court found that the defendant was thirty-five years of age at the time of the stop and had one year of college education. Defendant also acknowledged that he understood what was being asked of him. The district court found that from the time Agent Krebs first approached defendant to defendant's arrest, less than an hour elapsed. At no time did any of the agents expose their weapons to defendant. There was no repeated or prolonged questioning of defendant during his detention. Krebs testified he informed defendant he did not have to consent to a search when Krebs approached defendant in the baggage claim area, when he and defendant were walking to the police office, and a third time after they reached the police office. Finally, defendant's action of opening a piece of luggage in view of the agents and then providing Special Agent Bowie with the combination to the second suitcase indicates nonverbal consent. See United States v. Williams, 754 F.2d 672, 675 (6th Cir.1985) (defendant's setting the tumbler on a suitcase combination lock was an important factor in determining that the defendant consented to the search of the suitcase); United States v. Benitez, 899 F.2d 995, 998 (10th Cir.1990) (upon request for consent to search, defendant opened the trunk of his car and unzipped the suitcase); United States v. Wilson, 895 F.2d 168, 172 (4th Cir.1990) (per curiam) (search was voluntary where defendant raised arms in response to officer's request for permission to pat defendant down).
 
 
 31
 Defendant next argues that the search of his luggage should be invalidated because the police should have obtained a warrant to search his luggage while the defendant was en route from Los Angeles to Cleveland, and the police already had suspicions that defendant was involved in drug activity. Defendant relies on United States v. Cherry, 759 F.2d 1196 (5th Cir.1985), to support his argument. In Cherry, the Fifth Circuit found that the district court had erred in determining that evidence obtained by a warrantless search was admissible under the inevitable discovery theory because at the time the search was made, the officers had made no effort to begin the process to obtain a warrant. Id. at 1206-1207. However, the distinguishing factor between Cherry and the present case is that in Cherry, the defendant's consent to search was tainted by an illegal arrest. Id. That is not the situation here. As previously discussed, defendant was properly detained, and thus Cherry is not applicable to this case.
 
 
 32
 Finally, defendant argues that because he was not given a Miranda warning at the time he consented to the search, this is evidence that the search was involuntary. See Tillman, 963 F.2d at 144 (fact that police gave defective Miranda warnings is factor to consider in determining voluntariness of consent). However, as previously discussed, several other factors, including the fact that defendant was informed several times that he did not have to consent, indicated that the consent was voluntary. Considering the totality of the circumstances, the district court did not err in determining that the consent was voluntary and that the subsequent search was not in violation of the Fourth Amendment.
 
 III.
 
 33
 For the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Defendant claims that an agent told him that they were "really going to be p______ off" if you do not consent. Defendant's Brief at 5. However, these appear to be the words used by the defendant's counsel in phrasing his question. In any case, the district court did not make this finding