**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Brooke BAREFIELD, Defendant–
Appellant.**

No. 01–5403.

United States Court of Appeals,
Sixth Circuit.

Oct. 10, 2002.

Before MOORE and COLE, Circuit Judges; MARBLEY,* District Judge.

## OPINION

MOORE, Circuit Judge.

Brooke Barefield appeals her conviction of possession of cocaine with intent to distribute, arguing that the district court erred in denying her motion to suppress. Two police officers approached Barefield in the Cincinnati/Northern Kentucky International Airport, and after a discussion, they discovered a one-kilogram brick of cocaine strapped to her abdomen. The district court denied Barefield's motion to suppress, because it determined that the officers' encounter with Barefield was consensual and noncoercive. Because there is no basis in the record for finding a clear error in the district court's ruling, we AFFIRM.

* The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

## I

Officer Katherine Felice of the Kentucky State Police and Officer Dean Pattison of the Boone County Police are members of the Drug Interdiction Unit at the Cincinnati/Northern Kentucky airport, and as part of their job, they review lists of the passengers who are traveling through Cincinnati. These lists, called "passenger name records," contain passengers' names, travel itineraries, when and how they purchased their ticket, whether they checked baggage, and any changes they have made to their tickets, but they do not contain any information regarding passengers' gender, age, or race. Law enforcement officers review this information to see whether any travelers have characteristics that match the characteristics of those traveling with drugs.

On May 26, 1999, Felice and Pattison noticed that a passenger named Brooke Barefield would have a layover in Cincinnati in order to connect from her Delta flight from Los Angeles, California to her Comair flight to Louisville, Kentucky. The passenger name record indicated that Barefield had purchased a one-way ticket with $955 cash less than eight hours before the flight. The officers consider Los Angeles a "source" city for drugs. Based on these facts, the officers decided to investigate Barefield further. The passenger name list showed only two female names who were making that connection from Los Angeles to Louisville, so Felice and Pattison waited near the gate at which the Los Angeles flight would land. The officers figured that if they saw a female passenger ask where to find the connecting flight to Louisville, they might identify Barefield. One female passenger did ask, and the officers approached her. Felice

introduced herself as a police officer and asked to speak with the passenger, and the passenger agreed, but upon seeing the passenger's identification, the officers determined that she was not Barefield.

The officers then went to the gate from which the Comair flight was departing. Officer Pattison stood in line in front of the ticket agent, and he could see by the name on the ticket that the person in front of him was Barefield. He pointed out Barefield to Felice, and they watched her as she went through the line.

After speaking with the ticket agent, Barefield walked towards the restroom. Before she reached the restroom, Felice called after her, "Ma'am, ma'am." Barefield stopped, and Felice introduced herself as a police officer and asked if Barefield would talk to her. Barefield agreed, and on Felice's request, Barefield produced her California driver's license, which Felice handed to Pattison to take down the information. Felice informed Barefield that she and Pattison were narcotics officers looking for illegal drugs, and she asked whether Barefield was carrying any such items. Felice then asked Barefield if she would mind if they looked through Barefield's purse and carry-on bag. Barefield consented, but the searches of the bags found nothing.

Although the officers and Barefield offer different accounts of what happened next, the district court credited the officers' account. On the officers' account, Felice, who had noticed that Barefield's three layers of clothing were unusual for late spring, asked Barefield if she would mind if Felice patted her down. Barefield indicated that she would not mind, and Felice put her hand on Barefield's midsection. Felice felt a hard rectangular item that she recognized as a kilogram of drugs. She asked Barefield if it was drugs, Barefield said that it was, and Felice arrested her. Felice's and Pattison's accounts of the search are consistent, and both state that when Barefield agreed to be searched, she initially turned and put her hands up and against the wall.

Barefield's story differs. Barefield claims that when Felice asked to pat her down, Barefield replied by saying, "Excuse me?" Felice repeated the question and, as she did, reached out and touched Barefield's abdomen before Barefield could respond. Barefield states that she never consented to a search of her body.

The testimony appears to establish that throughout the process, the officers maintained a noncoercive atmosphere. The officers wore slacks and casual shirts, not their uniforms, and they carried no visible weapons, radios, or other markings of police authority. When the officers were speaking with Barefield, Pattison stood behind and to the right of Felice so that Barefield would not feel cornered. They remained in a wide-open area. Although Barefield stated at one point that she did not feel free to walk away, she also agreed that she had plenty of space to do so if she chose, that the officers did not tell her that she had to speak with them, and that Felice spoke politely and in a low-key manner.

Barefield was charged with possession with the intent to distribute one kilogram of cocaine in violation of 21 U.S.C. § 841(a)(1). On October 2, 2000, the district court held a hearing on Barefield's motion to suppress, at which Barefield and the two officers testified. On October 5, 2000, the district court denied Barefield's motion, determining that the search was consensual, and thus there was no detention or Fourth Amendment violation. Barefield entered a conditional plea of guilty, and she was sentenced to thirty months in prison.

## II.

In reviewing a district court's ruling on a motion to suppress, we review findings of fact for clear error, while reviewing conclusions of law de novo. *See Ornelas v. United States*, 517 U.S. 690, 691, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Bradshaw*, 102 F.3d 204, 209 (6th Cir.1996), *cert. denied*, 520 U.S. 1178, 117 S.Ct. 1453, 137 L.Ed.2d 558 (1997). In making such a determination, we view the evidence in the light most favorable to the district court's determination. *United States v. Williams*, 962 F.2d 1218, 1221 (6th Cir.), *cert. denied*, 506 U.S. 892, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992).

Barefield argues both that the officers detaining her lacked reasonable suspicion and that they did not obtain valid consent to search her. If we determine that the officers had her consent for the search, then there was no "seizure" within the meaning of the Fourth Amendment, and we need not inquire whether the officers had reasonable suspicion. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). We start with the question whether Barefield consented to the search.

The government bears the burden of proving that the defendant's consent was unequivocal, specific, intelligently given, and uncontaminated by any duress and coercion. *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir.1992). The determination of whether consent was given voluntarily is a question of fact, and the district court's findings will be reversed only if "the reviewing court, upon examination of the entire evidence, is left with a definite and firm conviction that a mistake has been committed." *Id.*

Although Barefield claims that she never consented, the district court specifically credited the officers' contrary account, according to which Barefield specifically con-sented to the search. There is no reason to question this determination, for two main reasons. First, "when there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *United States v. Ivy*, 165 F.3d 397, 401–02 (6th Cir.1998) (internal quotation omitted). That is precisely the case here, as the district court simply chose to credit the officers' account rather than Barefield's. Second, the officers' story is a credible one. Although consistency may neither be necessary nor sufficient in determining credibility, the fact that Officers Felice's and Pattison's testimony was consistent down to unusual details, like Barefield's turning around to be patted down as though in a prison search, bolsters their credibility. Accordingly, the district court's determination that Barefield consented to the search was not clearly erroneous.

The question then becomes whether Barefield's consent was voluntary. In evaluating the voluntariness of a consent to a search, the court must look at the totality of the circumstances. *See, e.g., United States v. Van Shutters*, 163 F.3d 331, 335 (6th Cir.1998), *cert. denied*, 526 U.S. 1077, 119 S.Ct. 1480, 143 L.Ed.2d 563 (1999). This can be done in two parts. First, the court should look at the individual subjected to the search, "including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." *Ivy*, 165 F.3d at 402. Barefield is a college student, and thus presumably understands these rights, but because the government provided no evidence on the issue of her comprehension of these issues, this first consideration is not very instructive.

The second consideration, however, which looks at "the details of the deten-

tion, including the length and nature of detention; the use of coercive or punishing conduct by the police; and indications of more subtle forms of coercion that might flaw an individual's judgment," *id.* (quotation and citations omitted), clearly overcomes any doubts left by the first. Every indication, including Barefield's own testimony, supports the district court's determination that the detention was in no way coercive. The agents wore civilian clothes, did not carry weapons, and politely sought and received Barefield's permission at every step. *Cf. United States v. Rose,* 889 F.2d 1490, 1493 (6th Cir.1989) (noting that those factors support finding of voluntariness). The officers positioned themselves so as not to corner Barefield, and they left her plenty of room to leave. The conversation lasted but a matter of moments in a public place. Unlike the defendant in *United States v. Worley,* 193 F.3d 380, 386 (6th Cir.1999), who expressed that he had no choice but to consent to the search, Barefield clearly and unequivocally expressed her consent. Consent under these circumstances is voluntary, and the district court's finding has ample support in the record.

Because the search was consensual, it was not a "seizure" under the Fourth Amendment. We need not consider whether the officers had reasonable suspicion for detaining Barefield.

## CONCLUSION

Because the search was consensual, we AFFIRM the district court's ruling.