939 A.2d 689

**Cindi Renee Katherine RUSH**

v.

**STATE of Maryland.**

**No. 31, Sept. Term, 2007.**

Court of Appeals of Maryland.

Jan. 11, 2008.

David A. Martella (Barry H. Hefland, Rockville), on brief, for petitioner/cross-respondent.

Diane E. Keller, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen.), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER, (Retired, specially assigned) DALE R. CATHELL, (Retired, specially assigned), JJ.

BATTAGLIA, J.

The case *sub judice* presents this Court with the issue of whether a police detective's modification of the *Miranda* warnings to state that Petitioner could be appointed counsel "at some time" satisfied the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This case also presents us with determining the scope of our appellate jurisdiction to consider a "cross-appeal" by a defen-

dant when the State notes an interlocutory appeal from the grant of a motion to suppress under Section 12–302(c)(3) of the Courts and Judicial Proceedings Article.[1]

Rush, the defendant below, filed a Petition for Writ of Certiorari, raising the following question for our review:

Did the Court of Special Appeals err in reversing the findings of the trial Court that an interrogating detective's modification of the *Miranda* warnings to suggest that she would be appointed counsel "at some time" improperly implied that the defendant could not have appointed counsel during her interrogation?

The State filed a Conditional Cross–Petition for Writ of Certiorari, presenting us with two additional questions:

1. Did the Court of Special Appeals lack jurisdiction to consider Rush's cross-appeal where the State noted an interlocutory appeal from the grant of a motion to suppress

---

1. Section 12–302(c)(3) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2006 Repl.Vol.), states in relevant part:

(3)(i) In a case involving a crime of violence as defined in § 14–101 of the Criminal Law Article, and in cases under §§ 5–602 through 5–609 and §§ 5–612 through 5–614 of the Criminal Law Article, the State may appeal from a decision of a trial court that excludes evidence offered by the State or requires the return of property alleged to have been seized in violation of the Constitution of the United States, the Maryland Constitution, or the Maryland Declaration of Rights.

(ii) The appeal shall be made before jeopardy attaches to the defendant. However, in all cases the appeal shall be taken no more than 15 days after the decision has been rendered and shall be diligently prosecuted.

(iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.

(iv) Except in a homicide case, if the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken. In that case, the State may not prosecute the defendant on those specific charges or on any other related charges arising out of the same incident.

under Section 12–302(c)(3) of the Courts and Judicial Proceedings Article?

2. Assuming arguendo that an appellate court has jurisdiction to consider Rush's interlocutory cross-appeal, does the record in this case establish that Rush's statement to the police was voluntary and not the product of any improper inducement? [2]

We shall hold that the advisements, as modified, did satisfy the requirements of *Miranda* and although Rush did not have the right to cross-appeal, she did have the right, in the State's appeal, to defend the ruling of the trial court on alternative grounds.

## I. Introduction

On May 1, 2006, Petitioner, Cindi Renee Katherine Rush, was arrested by Corporal Chinn and other members of the Prince George's County Police Criminal Investigation Division on a warrant charging her with murder in the first degree of Patricia Caniglia. Rush was transported to the District III Station where she was interviewed by Detective Kerry Jernigan.[3] The interview was digitally recorded, saved onto a DVD, and later transcribed. It began:

DETECTIVE JERNIGAN: It's Cindi, right?

THE DEFENDANT: Mm-hmm.

DETECTIVE JERNIGAN: How are ya?

THE DEFENDANT: All right.

DETECTIVE JERNIGAN: My name's Detective Jernigan.

THE DEFENDANT: Mm-hmm.

DETECTIVE JERNIGAN: Do you know why you're here?

THE DEFENDANT: No. I'd really like to know.

---

**2.** As we shall hold that the Court of Special Appeals lacked jurisdiction to consider Rush's interlocutory cross-appeal, we will not address the State's second question.

**3.** According to the transcription of the recording, the interview began at 6:27 p.m. and concluded at 10:23 p.m. At 9:12 p.m. Rush was offered food, which she declined.

DETECTIVE JERNIGAN: Okay. Well, I'm gonna tell ya. We're investigating the death of—was it Ms. Caniglia?

THE DEFENDANT: Uh-huh.

DETECTIVE JERNIGAN: I know you know her.

THE DEFENDANT: Yeah.

DETECTIVE JERNIGAN: Okay.

THE DEFENDANT: I went to her funeral.

DETECTIVE JERNIGAN: Okay. And what I wanna do is talk to you about that incident where she was killed.

THE DEFENDANT: Okay.

DETECTIVE JERNIGAN: Okay?

THE DEFENDANT: Okay.

DETECTIVE JERNIGAN: Do you have any problems talkin' to me?

THE DEFENDANT: No. That's fine.

DETECTIVE JERNIGAN: All right. You ever been—

THE DEFENDANT: Anything you wanna know.

DETECTIVE JERNIGAN: You ever been arrested before or—

THE DEFENDANT: No.

DETECTIVE JERNIGAN:—dealt with the police at all?

THE DEFENDANT: No.

DETECTIVE JERNIGAN: All right. Before I can talk to ya, I'm sure you're aware, you watch TV, I have to advise you of your constitutional rights. I can't ask you questions until I've done that.

THE DEFENDANT: Okay.

DETECTIVE JERNIGAN: And give you a opportunity—

THE DEFENDANT: Okay.

DETECTIVE JERNIGAN:—to decide if you wanna talk to me or not. But that's what I wanna talk to you about. I understand you used to work for them at one time or—

THE DEFENDANT: Yeah, mm-hmm.

DETECTIVE JERNIGAN:—know the, know Anthony?

THE DEFENDANT: I used to live with them. I used to work for them about three years ago.

DETECTIVE JERNIGAN: Okay.

THE DEFENDANT: Mm-hmm.

DETECTIVE JERNIGAN: All right. Well, let's get the formalities out of the way.

THE DEFENDANT: Okay.

DETECTIVE JERNIGAN: Need anything to drink or anything or—

THE DEFENDANT: No. I'm okay.

DETECTIVE JERNIGAN: Okay.

THE DEFENDANT: Actually, I was wonderin', I don't know why I'm even here. The detective, police showed up at my door and arrested me, said I had a warrant.

DETECTIVE JERNIGAN: Okay. Cindi, how far'd ya get in school?

THE DEFENDANT: Ninth grade.

DETECTIVE JERNIGAN: Do you know how to read?

THE DEFENDANT: Yeah, I've taken GED classes and I just haven't been able to go take the test. I'm very (unintelligible). I have my CNA license and everything.

DETECTIVE JERNIGAN: Okay. All right. Just to prove to me that you know how to read—

THE DEFENDANT: Mm-hmm.

DETECTIVE JERNIGAN:—I'm gonna let you read a portion of this statement for me, okay?

THE DEFENDANT: Okay.

DETECTIVE JERNIGAN: Can you move that chair on up? Read this first sentence—

THE DEFENDANT: Mm-hmm.

DETECTIVE JERNIGAN:—on the top line for me.

THE DEFENDANT: "I am now going to read to you your rights under the law."

DETECTIVE JERNIGAN: Very good. All right. I'm gonna read the rest to you out loud and then we'll go over it together, okay?

THE DEFENDANT: Okay.

DETECTIVE JERNIGAN: "I'm now going to read you your rights under the law. If you do not understand something that I say to you, please stop me and I will explain it to you. You have the right to remain silent. If you choose to give up this right, anything that you say can be used against you in court. You have the right to talk to a lawyer before you're asked any questions. You have the right, you have, you have the right to have a lawyer with you while being questioned. If you want a lawyer and can't afford one, one will be provided to you **at some time at no cost.**" If at some point in time during our questioning you decide you don't wanna talk anymore, that's your right as well. Okay?

THE DEFENDANT: Mm-hmm.

DETECTIVE JERNIGAN: All that make sense to ya?

THE DEFENDANT: Yeah.

DETECTIVE JERNIGAN: All right. So we go through a series of questions here. The first one is you understand what I just, I, I just read to ya?

THE DEFENDANT: Yes.

DETECTIVE JERNIGAN: You're willing to talk to me at this time without a lawyer?

THE DEFENDANT: Yes.

DETECTIVE JERNIGAN: Okay. I haven't promised you anything or given you any inducements to talk to me at this time; is that correct?

THE DEFENDANT: Right.

DETECTIVE JERNIGAN: Okay. And you're not under the influence of any drugs—

THE DEFENDANT: No.

DETECTIVE JERNIGAN:—or alcohol at this time?

THE DEFENDANT: No.

DETECTIVE JERNIGAN: Okay.

THE DEFENDANT: I mean do I need a lawyer or somethin' or is it, am I just in here for—

DETECTIVE JERNIGAN: Well—

THE DEFENDANT:—questioning? I mean—

DETECTIVE JERNIGAN:—if you decide at that, any point in time during our questioning that you feel that that'd be best for you, then you let me know that. Okay?

THE DEFENDANT: I'm just wonderin' why it's asking if I need a lawyer. You know, but anything you guys need to know, I'm willing to help.

DETECTIVE JERNIGAN: Sign there for me, and just note on the bottom below your signature what level of education you have.

(emphasis added). Rush signed the Advice of Rights and Waiver Form, and during the interview made several inculpatory statements which she committed to writing.

She subsequently was indicted on one count of premeditated murder, two counts of robbery with a dangerous weapon, two counts of conspiring to commit robbery with a dangerous weapon, two counts of using a handgun in the commission of a felony or crime of violence, and one count of first degree assault. Rush timely filed a motion to suppress in which she alleged that her statements were obtained by Detective Jernigan following advisements that did not meet the requirements of *Miranda* and that, in addition, the statements were obtained through threats and inducements and, therefore, were not voluntary. During the suppression hearing, Corporal Chinn and Detective Jernigan testified, after which Rush testified; Detective Jernigan related that he had modified the standard *Miranda* advisement regarding the appointment of counsel by adding the phrase "at some time at no cost" to indicate that "[a lawyer] is not going to magically appear. It's going to take a little time for a lawyer to be provided to her for a representation. You know, that's something that is going to just take a little time."

Rush contended that her inculpatory statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. at 436, 86 S.Ct. at 1602, 16 L.Ed.2d at 694,[4] because Detective Jernigan's modification caused confusion as to whether she could have counsel present during the questioning. Additionally, Rush argued that her question to Detective Jernigan, "do I need a lawyer?," was a request for counsel that should have caused the detective to cease the questioning. Rush also argued that her inculpatory statements were not voluntary as they were obtained through threats and inducements.

Conversely, the State argued that Rush was not confused as to her *Miranda* rights, that she stated that she understood the advisements which were provided orally by Detective Jernigan and which she also read on the Advice of Rights and Waiver Form. The State also contended that Rush's question "do I need a lawyer?" was not an unambiguous invocation of her right to counsel and that Detective Jernigan's response of "This is entirely up to you. At any time during our questioning, you feel you need a lawyer, just let me know" was sufficient. The State further argued that Rush's statements were voluntary.

The hearing judge ruled that Rush's statements had been obtained in violation of *Miranda*, due to Detective Jernigan's insertion of the phrase "at some time" when reciting that a lawyer would be provided if Rush could not afford one. The Court stated that the addition of the phrase "left a false impression that she couldn't have one now" and therefore violated the dictates of *Miranda* and that her statement would be suppressed on that ground. The hearing judge specifically noted on the record that he was not granting the motion to suppress on the alternative ground of involuntariness.

---

4. In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–07 (1966), the Supreme Court held that when a criminal suspect is in custody, before being questioned by the police he must be advised that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

The State noted an appeal of the decision to the Court of Special Appeals pursuant to Section 12–303(c)(3) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2006 Repl.Vol.). Rush noted what she termed a "cross-appeal," challenging the circuit court's ruling that the statements should not be suppressed on the alternative ground that they were involuntary.

The intermediate appellate court held that the circuit court erred by suppressing Rush's statements on *Miranda* grounds, applying the standard articulated by the Supreme Court in *Duckworth v. Eagan*, 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989), to conclude that, taken in their totality, the advisements provided Rush adequately communicated her rights under *Miranda*. *State v. Rush*, 174 Md.App. 259, 282, 921 A.2d 334, 347 (2007). In a reported opinion, the court determined that it had jurisdiction to consider whether the statements should have been suppressed on the alternative involuntariness ground, however, and upheld the suppression on that ground. *Id.* at 282–83, 921 A.2d at 347. The intermediate appellate court considered not only the plain language of Section 12–303(c)(3) of the Courts and Judicial Proceedings Article but also analogous statutes in Illinois and federally and reasoned that:

> [T]he general principle that a reviewing court may uphold the final judgment of a lower court on any ground adequately shown by the record is well-established in Maryland. The legislature created the right of immediate appeal for the State at issue here in order to equalize the opportunities the parties to criminal cases have for meaningful correction of erroneous pretrial evidentiary rulings, made on constitutional grounds.... The legislative goal of equalization is most thoroughly and efficiently accomplished when the general scope of appellate review principle is applied in the State's immediate appeal as it is in the defendant's appeal from a final judgement.

*Id.* at 293, 921 A.2d at 353.

Thereafter, Rush filed a Petition for Writ of Certiorari, and the State filed a Conditional Cross–Petition for Writ of Certio-

rari, both of which we granted. *Rush v. State,* 399 Md. 595, 925 A.2d 634 (2007).

## II. Discussion

Rush contends that the Court of Special Appeals erred in concluding that Detective Jernigan's modification of the advisement that Rush had the right to appointed counsel to read "If you want a lawyer and can't afford one, one will be provided to you at some time at no cost" did not violate the protections afforded by *Miranda.* She argues that Detective Jernigan's modification is significantly different from the changes made to the warnings in *Duckworth v. Eagan,* 492 U.S. at 195, 109 S.Ct. at 2875, 106 L.Ed.2d at 166, and *California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (per curiam), cases in which the Supreme Court held that variances in standard advisements conformed with *Miranda* because the warnings provided her did not adequately advise her of her right to have appointed counsel present at questioning and linked the temporal right to appointed counsel to a point in time after the interrogation. Rush also argues that Detective Jernigan's additional language was purposefully included to minimize the likelihood that Rush would request appointed counsel during the interview, particularly as the warnings were provided after some initial questioning had occurred. Rush additionally contends that the Court of Special Appeals erred in not taking into consideration the circuit court's discussion suggesting that Detective Jernigan's alteration was likely to create a false impression because of Rush's limited education and lack of familiarity with the criminal justice system that Rush could not have appointed counsel present during questions.

Conversely, the State argues that the Supreme Court's opinions in *Prysock* and *Duckworth* have established that modifications to the standard *Miranda* advisements do not render advisements inadequate that otherwise satisfy the *Miranda* requirements. The State also rejects Rush's assertion that the additional language was calculated to elicit a confession and characterizes the lower court's references to Rush's

education and lack of contact with the police as pertaining to the issue of voluntariness rather than a potential *Miranda* violation.

The State further contends that the Court of Special Appeals lacked jurisdiction to consider whether Rush's statements were involuntary because the State had noted an interlocutory appeal from the grant of a motion to suppress under Section 12–302(c)(3) of the Courts and Judicial Proceedings Article. The State argues that appellate jurisdiction in Maryland is dependent upon a statutory grant of power, and Section. 12–302(c)(3) of the Courts and Judicial Proceedings Article does not sanction a cross-appeal. The State argues that the intermediate appellate court's reliance on an Illinois opinion, *People v. Johnson,* 208 Ill.2d 118, 281 Ill.Dec. 38, 803 N.E.2d 442 (2003), and the federal courts' construction of 18 U.S.C. § 3731, which it termed the "federal analog" to Section 12–302(c), was misplaced, because Section 12–302(c)(3) is substantially different from the Illinois and federal statutes in that the potential State charges must be dismissed pursuant to the Maryland statute if the State's appeal is unsuccessful.

In reply to the Cross–Petition question, Rush contends that the Court of Special Appeals correctly addressed the issue of voluntariness, citing Maryland Rule 8–202(e)[5] for the proposition that if one party files an appeal, the other party may likewise file an appeal within a certain time frame. Rush also argues that because the issue of involuntariness was clearly articulated in the record, it would be a waste of judicial time and resources not to consider the alternative ground during the State's appeal.

## A. *Miranda* Violation

In reviewing a circuit court's grant or denial of a motion to suppress evidence, we ordinarily consider only the

---

5. Maryland Rule 8–202(e) states:

> (e) **Appeals by other party—Within ten days.** If one party files a timely notice of appeal, any other party may file a notice of appeal within ten days after the date on which the first notice of appeal was filed or within any longer time otherwise allowed by this Rule.

evidence contained in the record of the suppression hearing. *State v. Tolbert,* 381 Md. 539, 548, 850 A.2d 1192, 1197 (2004); *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439, 443–44 (2003); *White v. State,* 374 Md. 232, 249, 821 A.2d 459, 469 (2003). The factual findings of the suppression court and its conclusions regarding the credibility of testimony are accepted unless clearly erroneous. *Tolbert,* 381 Md. at 548, 850 A.2d at 1197. We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party. *Id.; Rucker,* 374 Md. at 207, 821 A.2d at 444; *White,* 374 Md. at 249, 821 A.2d at 469. We "undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case." *Tolbert,* 381 Md. at 548, 850 A.2d at 1197; *White,* 374 Md. at 249, 821 A.2d at 469.

The seminal issue in this case involves the application of *Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07, in which the Supreme Court held that prior to custodial interrogation, an individual must be advised that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." The individual may make a voluntary and knowing waiver of his right to counsel, in which event the police are free to question him. *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707. During the questioning, if the individual states that he wants to speak with an attorney, there can be no further questioning until counsel has been provided or the suspect himself initiates further communication with the police. *Id.* at 444–45, 86 S.Ct. at 1612, 16 L.Ed.2d at 707.

The Supreme Court held in *Miranda* that a recitation of the warnings stated in that opinion, or a "fully effective equivalent," is a necessary prerequisite to the admissibility of inculpatory statements sought to be introduced as evidence. *Id.* at 476, 86 S.Ct. at 1629, 16 L.Ed.2d at 725. Since its ruling in *Miranda,* the Court has noted that there is no "desirable rigidity in the *form* of the required [*Miranda* ] warnings," and

that *"Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures." *Prysock,* 453 U.S. at 359, 101 S.Ct. at 2809, 69 L.Ed.2d at 701(emphasis in original).

In *California v. Prysock,* 453 U.S. at 355, 101 S.Ct. at 2806, 69 L.Ed.2d at 696, the Court addressed modifications of the requisite advisements. In *Prysock,* the Court considered the decision of the California Court of Appeals which had held that the warnings given to a suspect were inadequate under *Miranda* because he was not explicitly informed of his right to have an attorney appointed before questioning, when he was informed that "[y]ou have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during the questioning" and "you have the right to have a lawyer appointed to represent you at no cost to yourself." *Id.* at 356, 101 S.Ct. at 2808, 69 L.Ed.2d at 699–700. The Supreme Court reversed, holding that the advisements satisfied the requirements of *Miranda* because he "was told of his right to have a lawyer present prior to and during interrogation, and his right to have a lawyer appointed at no cost if he could not afford one. These warnings conveyed ... his right to have a lawyer appointed if he could not afford one prior to and during interrogation." *Id.* at 361, 101 S.Ct. at 2810, 69 L.Ed.2d at 702.

In its analysis in *Prysock,* the Court noted that "[o]ther courts considering the precise question presented by this case ... have not required a verbatim recital of the words of the *Miranda* opinion but rather have examined the warnings given to determine if the reference to the right to appointed counsel was linked with some future point in time after the police interrogation." *Id.* at 360, 101 S.Ct. at 2810, 69 L.Ed.2d at 701. The Court noted examples of defective advisements, such as the statement that "[you can] have an attorney appointed to represent you when you first appear before the U.S. Commissioner or the Court," *United States v. Garcia,* 431 F.2d 134 (9th Cir.1970), and "if [you are] charged ... [you] would be appointed counsel." *People v. Bolinski,* 260 Cal.App.2d 705, 718, 67 Cal.Rptr. 347 (Cal.Ct.App.1968).

In 1989, the Court again addressed the impact of modifications to *Miranda* advisements in *Duckworth v. Eagan,* 492 U.S. at 195, 109 S.Ct. at 2875, 106 L.Ed.2d at 166. Considering facts very similar to those of the case at bar, the Court was asked to determine whether the following oral and written warnings provided to a suspect prior to police questioning complied with *Miranda:*

"Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. *You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.* You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer."

*Id.* at 198, 109 S.Ct. at 2877–78, 106 L.Ed.2d at 174 (emphasis in original). Although the United States Court of Appeals for the Seventh Circuit had held that the warnings were "constitutionally defective" because the statement that counsel would be appointed "if and when you go to court" did not adequately communicate to an indigent suspect that he had the right to appointed counsel before interrogation and linked that right to a future event, *Eagan v. Duckworth,* 843 F.2d 1554, 1557 (7th Cir.1988), the Supreme Court disagreed.

In reversing, the Supreme Court iterated that *Miranda* warnings do not need to be provided in any exact form: "Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda.*'" *Duckworth,* 492 U.S. at 203, 109 S.Ct. at 2880, 106 L.Ed.2d at 177, quoting *Prysock,* 453 U.S. at 361, 101 S.Ct. at 2810, 69 L.Ed.2d at 702. The Court concluded that the

warnings provided "touched all of the bases required by *Miranda*," as Duckworth was told "that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to speak to an attorney before and during questioning, that he had 'this right to the advice and presence of a lawyer even if [he could] not afford to hire one' and that he had the 'right to stop answering at any time until [he] talked to a lawyer.'" *Id.* Regarding the variance in the language that a lawyer would be appointed "if and when you go to court," the Court noted that "this instruction accurately described the procedure for the appointment of counsel in [that state]" and that "it must be relatively commonplace for a suspect, after receiving *Miranda* warnings, to ask *when* he will obtain counsel. The 'if and when you go to court' advice simply anticipates that question." *Id.* at 204, 109 S.Ct. at 2880–81, 106 L.Ed.2d at 177–78 (emphasis in original).

The Court also clarified its dicta in *Prysock*, 453 U.S. at 360, 101 S.Ct. at 2810, 69 L.Ed.2d at 701, that seemingly suggested that *Miranda* warnings would not be sufficient "if the reference to the right to appointed counsel was linked [to a] future point in time after the police interrogation." The Court explained that "the vice referred to in *Prysock* was that such warnings would not apprise the accused of his right to have an attorney present if he chose to answer questions" and noted that the "warnings in this case did not suffer from that defect," because the warnings, taken "in their totality," adequately expressed the right to have counsel present at questioning. *Duckworth*, 492 U.S. at 205, 109 S.Ct. at 2881, 106 L.Ed.2d at 178.

Since the Supreme Court's holding in *Duckworth*, a number of federal and state courts have had the opportunity to explore and apply its requisites. Generally, their holdings posit that modifications of advisements meet the requirements of *Miranda* so long as the warnings, taken in their totality, adequately convey the essence of that case, that the suspect had the right to remain silent, that anything he said could be used against him in court, that he had the right to speak to an attorney before and during questioning, and that he had he

had the right to court appointed counsel if he could not afford private counsel. *See Cummings v. Polk*, 475 F.3d 230 (4th Cir.2007) (holding that advisements that included the assertion that the suspect could be required to pay for an appointed lawyer did not contravene his rights under *Miranda* where that was an accurate description of the state's procedure for the appointment of counsel); *United States v. Caldwell*, 954 F.2d 496 (8th Cir.1992) (police officer's failure to specifically warn defendant of the right to counsel before and during interrogation did not make the *Miranda* warnings inadequate where officer did generally advise defendant that he had the right to an attorney); *Williams v. State*, 321 Ark. 344, 902 S.W.2d 767 (1995) (holding that advisements that stated that "You have the right to consult an attorney before answering any questions or making a statement, and you may have him present with you during questioning" and "If you cannot afford an attorney *as determined by the Court* one will be appointed for you at no cost to you" were equivalent to those articulated in *Miranda* ) (emphasis in original); *Henson v. United States*, 563 A.2d 1096 (D.C.1989) (holding that an officer's expansion on the standard warnings that "the police department does not provide attorneys for defendants, but [the suspect] would have an opportunity to call himself an attorney" did not create the impression that the suspect must locate an attorney himself and so make the advisements invalid under *Miranda* ); *State v. Schwartz*, 467 N.W.2d 240 (Iowa 1991) (holding that advisement that "You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during the questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court" was adequate under *Miranda* as it accurately reflected the procedure for the appointment of counsel in that state); *Commonwealth v. Colby*, 422 Mass. 414, 663 N.E.2d 808 (1996) (holding that a departure from the standard *Miranda* warnings that stated "if he could not afford an attorney, the Commonwealth would attempt to provide one

for him" was harmless error); *State v. Fernando–Granados,* 268 Neb. 290, 682 N.W.2d 266 (2004) (holding that *Miranda* warnings which when translated into Spanish stated that "If you don't have money to employ a lawyer, the court . . . could or be able to or may name one, one lawyer to represent . . . the person" adequately informed suspect of his rights); *State v. Dailey,* 53 Ohio St.3d 88, 559 N.E.2d 459 (1990) (holding that advisements that "You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning" and "You have the same right to the advice and presence of a lawyer even if you cannot afford to hire one" adequately apprised the suspect of his rights under *Miranda* ); *State v. Strain,* 779 P.2d 221 (Utah 1989) (holding that detective's advisement that suspect had the right to have an attorney appointed for him by court "at a later date" was not defective under *Miranda* ).[6]

Conversely, the gravamen of inadequacy of a modification was in omission of one of more of the warnings required by *Miranda* or a translation into a foreign language that modified in such a way as to no longer communicate the original warnings. *See United States v. Street,* 472 F.3d 1298 (11th Cir.2006) (holding that oral *Miranda* warnings that did not include an advisement that anything that the suspect said could be used against him in court were inadequate); *United States. v. Perez–Lopez,* 348 F.3d 839 (9th Cir.2003) *(Miranda* warning translated to "[i] n case you don't have enough money or funds, you have the right to *solicit* the Court for an attorney" held inadequate in conveying the government's obligation to provide an attorney to a Spanish-speaking defendant) (emphasis added); *United States v. Tillman,* 963 F.2d 137 (6th Cir.1992) (concluding that *Miranda* warnings that did not include an advisement that anything that the suspect said could be used against him in court were inadequate); *State v. Ramirez,* 135 Ohio App.3d 89, 732 N.E.2d 1065 (1999) (holding that attempts to translate *Miranda* rights into Spanish utiliz-

---

6. *See Custodial Interrogations,* 34 Geo. L.J. Ann. Rev.Crim. Proc. 3 (2005), for additional post-*Duckworth* holdings.

ing a term that meant "right hand side" instead of "legal right" failed to communicate that anything suspect said could be used against him and that he had a right to an attorney free of charge).[7]

■ In the current case, Rush argues that not only did Detective Jernigan's modification of the advisement to the right of appointed counsel to read, "If you want a lawyer and can't afford one, one will be provided to you at some time at no cost," stray from that which was articulated in *Miranda,* but it also failed to effectually communicate the mandatory rights because Rush was given the impression that appointed counsel could be present in the future, but not during the questioning that was about to commence. The State argues that the addition of the phrase was meant only to communicate that it would take some time for counsel to be appointed to represent Rush, and that the advisements provided to her both orally and in writing effectively informed her of her right to have counsel present both before and during questioning. The circuit court agreed with Rush, while the Court of Special Appeals agreed with the State.

We agree with the State that Rush's advisements were adequate under *Miranda.* She was provided with warnings similar to those reviewed by the Supreme Court in *Duckworth,* the advisements given to Rush being:

"I'm now going to read you your rights under the law. If you do not understand something that I say to you, please stop me and I will explain it to you. You have the right to remain silent. If you choose to give up this right, anything that you say can be used against you in court. You have the right to talk to a lawyer before you're asked any questions. You have the right, you have, you have the right to have a lawyer with you while being questioned. If you want a

---

**7.** Rush cites to *United States v. Connell,* 869 F.2d 1349 (9th Cir.1989), *United States v. Noti,* 731 F.2d 610 (9th Cir.1984), and *Minnesota v. McBroom,* 394 N.W.2d 806 (Minn.Ct.App.1986) as support for her position. Those cases were decided prior to the Supreme Court's decision in *Duckworth,* however, and so are inapposite.

lawyer and can't afford one, one will be provided to you at some time at no cost." If at some point in time during our questioning you decide you don't wanna talk anymore, that's your right as well. Okay?

Rush was also provided with an Advice of Rights and Waiver Form which she read, initialed, and signed. The Form stated in pertinent part:

I am now going to read to you your rights under the law. If you do not understand something that I say to you, please stop me, and I will explain it to you.

1. You have the right to remain silent. If you choose to give up this right, anything that you say can be used against you in court.

2. You have the right to talk to a lawyer before you are asked any questions and to have a lawyer with you while you are being questioned.

3. If you want a lawyer, but cannot afford one, a lawyer will be provided to you [@ some time] [8] at no cost.

4. If you want to answer questions now without a lawyer, you still have the right to stop answering questions at any time.

Assessing the totality of the advisements, both oral and written, we conclude that they sufficiently communicated all of the rights required by *Miranda.* Specifically, Rush was told that she could speak with a lawyer before being questioned and at any time during questioning. The modification of the advisements did not tie her right to counsel to a future event or to her ability to obtain a lawyer herself; rather, as in *Duckworth,* the modified language only clarified, in a separate advisement, how and when appointed counsel would be provided. Read objectively, the modified language does not suggest, as Rush argues, that appointed counsel could not be present during questioning.

---

8. The addition indicated by the brackets was handwritten on the form.

Rush contends, however, that in assessing the adequacy of the warnings we need to look also at the circumstances in which the advisements were made. Specifically, she would have us focus our attention on the intention behind the alteration to the standard advisements, the fact that the advisements were given after some initial questioning had occurred and the likelihood that Rush would be confused by the alteration given her limited education and lack of experience with the police and courts.

Rush cites the plurality opinion in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), to support her contention that circumstances surrounding the provision of the advisements must also be considered in assessing the adequacy of the warnings, specifically that Detective Jernigan asked her preliminary questions before providing the *Miranda* advisements and that Rush's ninth-grade education and unfamiliarity with the criminal justice system made it more difficult for her to understand the advisements. In *Seibert,* the Court was asked to determine whether inculpatory statements, obtained pursuant to a police protocol whereby advisements of the rights to silence and counsel were not given until the interrogation produced a confession, at which point full *Miranda* advisements were given and the suspect was asked to repeat his inculpatory statements, were admissible. In conducting its analysis, the plurality stated that "it would be absurd to think that mere recitation of the litany [of warnings] suffices to satisfy *Miranda* in every conceivable circumstance," but rather it must be determined "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires" to convey that the suspect had "a real choice" regarding whether to stop talking to the police. *Id.* at 611–12, 124 S.Ct. at 2610, 159 L.Ed.2d at 654–55. The plurality held that "question-first" interrogation procedures which provided midstream advisements of rights were not sufficient under *Miranda,* because "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone

persist in so believing once the police began to lead him over the same ground again." *Id.* at 613, 124 S.Ct. at 2611, 159 L.Ed.2d at 655–56.

■ In the present case, Rush, relying upon the plurality's opinion in *Seibert*, argues that Detective Jernigan's posing preliminary questions before advising her of her rights was a tactic meant to trick her into confessing, especially as it was coupled with a modification of the *Miranda* advisement ("If you want a lawyer and can't afford one, one will be provided to you at some time at no cost."). We disagree. Rush's interview did not violate *Miranda* because her preliminary questioning was properly characterized by the Court of Special Appeals as "introductory in nature," "meant to orient Rush ('Do you know why you're here?') and to determine whether she had any first-hand familiarity with the *Miranda* warnings before [Detective Jernigan] gave them to her ('You ever been arrested before . . . ?')," *State v. Rush*, 174 Md.App. at 280–81, 921 A.2d at 346, and is not analogous to the two part, "question-first" tactics used by the police in *Seibert*. The police officer in *Seibert* intentionally questioned the suspect for 30 to 40 minutes to elicit a confession of criminal intent prior to providing the *Miranda* warnings, while Detective's Jernigan's preliminary questions lasted only a few moments and the only substantive information obtained was that Rush stated that she used to work for and live with the victims. Unlike in *Seibert*, the initial statements and questions posed by Detective Jernigan, even when coupled with the modified advisement, would not lead a "reasonable person in [Rush's] shoes" to conclude that she had no genuine choice whether to refuse to be questioned by the police.

Rush also contends that her limited education and lack of experience with the criminal justice system are circumstances which caused her to misunderstand the *Miranda* advisements, based upon the hearing judge's musings:

> But I think that was an inducement. I don't think it was intentional, but I definitely, in light of all of the circumstances: a person with a 9th grade education; no prior

contact with the Court; that's what I heard from the tape or from the CD.

And that, alone, probably wouldn't be sufficient for me to suppress the statement, but then you have to take into consideration that when we get to the statement about the lawyer; you couple those two, that's a violation of *Miranda;* not a violation of Maryland common law. That's important, the distinction being made. When the Detective told her that you would get one at some time, that left a false impression that she couldn't have one now. All she had to do is say, I want one now. We lawyers know that. Lay people don't. See, that puts an end to it.

While it is true that in determining the voluntariness of a confession we "look to all elements of the interrogation, including the manner in which it was conducted, the number of officers present, and the age, education, and experience of the defendant," *Williams v. State,* 375 Md. 404, 429, 825 A.2d 1078, 1092 (2003), that is not true of the question of sufficiency of *Miranda* warnings. Whether a suspect in custody is mature or young, a Ph.D. or a high school drop-out, a repeat offender familiar with the criminal justice system or an individual with a previously clean record does not vary the fact that sufficient *Miranda* warnings must be given.

Analyzing the advisements provided by Detective Jernigan under the standard articulated by the Supreme Court in *Duckworth,* we affirm the holding of the Court of Special Appeals that the circuit court erred in ruling that Rush was not sufficiently advised of her rights in accordance with *Miranda* and in granting the motion to suppress her inculpatory statements on that ground.[9]

### B. Involuntariness Issue

Rush noted what she termed a "cross-appeal." The docket entries, however, reflect that Rush's "Motion [was] Granted,"

---

9. While we concluded that Detective Jernigan's modification of the standard advisements did not violate *Miranda,* we would discourage deviation from the standard form, as modifications have the potential to render such advisements inadequate.

indicating that the judge granted Rush's Motion to Suppress in its entirety; additionally, the ruling from the bench is ambiguous:

> The Court is required to consider the totality of the circumstances, and in my ruling, I am considering that. Court reviewed the Court's own docket, or its own file which has in it the Application For Statement of Charges. That's the information that the Prince George's County Police had when they got the original warrant for murder.

> And so when the Detective told her that was bullshit, that's exactly what he believed based on the information he had; that she was, in fact, telling him a story that didn't even come close to what they had already; he told her why.

> Court finds that in doing that, he left within her mind the impression that the only way she could be helped would be to tell the truth; ultimately, she did.

> But I think that was an inducement. I don't think it was intentional, but I definitely, in light of all of the circumstances: a person with a 9th grade education; no prior contact with the Court; that's what I heard from the tape or from the CD.

> And that, alone, probably wouldn't be sufficient for me to suppress the statement, but then you have to take into consideration that when we get to the statement about the lawyer; you couple those two, that's a violation of *Miranda;* not a violation of Maryland common law. That's important, the distinction being made. When the Detective told her that you would get one at some time, that left a false impression that she couldn't have one now. All she had to do is say, I want one now. We lawyers know that. Lay people don't. See, that puts an end to it.

> So when you take that into consideration, along with the only thing that could help her is to tell the truth, well, it might have helped her in the eyes of the All Mighty, if she so believed, or it might help her morally in her soul, but based on information the Detective had, there was no way

that was going to help her, and he had every reason to know that. . . .

The Motion to Suppress, for the reasons stated—

\* \* \*

I understand that was a violation of *Miranda.*

\* \* \*

Not a violation of common law.

▆▆▆ Although one cannot appeal from a favorable ruling, *see Administrator, Motor Vehicle Administration v. Vogt,* 267 Md. 660, 664, 299 A.2d 1, 3 (1973) ("[G]enerally, a party cannot appeal from a judgment or order which is favorable to him, since he is not thereby aggrieved."); *Thompson v. State,* 395 Md. 240, 248–49, 909 A.2d 1035, 1040–41 (2006), the Court of Special Appeals and the parties proceeded on the basis that the trial court did not rule entirely favorably to Rush on the issue of voluntariness. Rush asks us to consider her complaint regarding the ruling on voluntariness in tandem with the State's appeal because a voluntary statement, albeit one not satisfying the *Miranda* dictates, may be used for impeachment purposes, *see Brittingham v. State,* 306 Md. 654, 661, 511 A.2d 45, 48. The State asks this Court to determine whether the Court of Special Appeals had "jurisdiction to consider Rush's cross-appeal" on the alternative ground of involuntariness.

In determining whether it had jurisdiction to entertain a defendant's cross-appeal, the Court of Special Appeals first examined the plain language of Section 12–303(c)(3) of the Courts and Judicial Proceedings Article, the legislative history of the statute, and this Court's jurisprudence construing authority to hear interlocutory appeals and noted that:

What little direct Maryland precedent there is would seem, therefore, to militate in favor of the most narrow interpretation of the State's right to appeal a decision to suppress evidence as not including a challenge by the defendant to the court's unfavorable ruling on an alternative ground.

*State v. Rush,* 174 Md.App. at 289, 921 A.2d 334 at 351. The Court of Special Appeals did not end its analysis, however, but chose also to consider "the general principles that guide the scope of appellate review ... developed in the context of appeals from final judgments," *id.,* and found cases construing analogous statutes in Illinois and the federal system as providing appellate courts with jurisdiction to consider defendant's alternative suppression arguments; the intermediate appellate court reasoned that

> the general principle that a reviewing court may uphold the final judgment of a lower court on any ground adequately shown by the record is well-established in Maryland. The legislature created the right of immediate appeal for the State at issue here in order to equalize the opportunities the parties to criminal cases have for meaningful correction of erroneous pretrial evidentiary rulings, made on constitutional grounds.... The legislative goal of equalization is most thoroughly and efficiently accomplished when the general scope of appellate review principle is applied in the State's immediate appeal as it is in the defendant's appeal from a final judgement.

*Id.* at 293, 921 A.2d at 353.

The State contends that it was error for the intermediate appellate court to consider a defendant's cross-appeal as Section 12–302(c)(3) of the Courts and Judicial Proceedings Article makes no reference to cross-appeals. The State also contends that the intermediate appellate court's reliance on federal and Illinois jurisprudence to support its assertion that it has jurisdiction to consider a defendant's cross-appeal is misplaced because of the significant differences between the federal and Illinois statutes and Section 12–302(c)(3) and its legislative history.

Rush, conversely, argues that the intermediate appellate court did have jurisdiction to consider a cross-appeal under Maryland Rule 8–202(e), which mandates that "[i]f one party files a timely notice of appeal, any other party may file a notice of appeal within ten days." Rush also contends that

judicial time and resources would be wasted if the appellate court were unable to hear the cross-appeal at the same time the State's appeal is granted.

In analyzing whether an appellate court has jurisdiction to consider a cross-appeal positing alternative grounds for the grant of a motion to suppress, the Court of Special Appeals appropriately began its inquiry by noting that "[i]n Maryland, '[a]ppellate jurisdiction is established by "constitutional provisions, statutory provisions, and rules; jurisdiction cannot be conferred by consent of the parties." ' " *State v. Rush,* 174 Md.App. at 283, 921 A.2d at 347, quoting *Shofer v. Stuart Hack Co.,* 107 Md.App. 585, 596, 669 A.2d 201, 206 (1996), quoting in turn *Pearlstein v. Maryland Deposit Ins.,* 79 Md.App. 41, 48, 555 A.2d 528, 532 (1989). The question then becomes whether Section 12–302(c)(3) of the Court and Judicial Proceedings Article, or any other statute, rule, or constitutional provision, grants jurisdiction to entertain a defendant's interlocutory cross-appeal when the State has appealed the grant of a motion to suppress.

It is well established that "[t]he cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature." *Stoddard v. State,* 395 Md. 653, 661, 911 A.2d 1245, 1249 (2006); *Chow v. State,* 393 Md. 431, 443, 903 A.2d 388, 395 (2006); *Collins v. State,* 383 Md. 684, 688, 861 A.2d 727, 730 (2004). We begin our analysis by first looking to the normal, plain meaning of the language of the statute so that "no word, clause, sentence or phrase is rendered superfluous or nugatory." *Chow,* 393 Md. at 443, 903 A.2d at 395; *Collins,* 383 Md. at 688–91, 861 A.2d at 730–32. Further, whenever possible, an interpretation should be given to the statutory provisions which does not lead to unreasonable or illogical consequences. *Stoddard v. State,* 395 Md. 653, 663, 911 A.2d 1245, 1250 (2006); *Blake v. State,* 395 Md. 213, 224, 909 A.2d 1020, 1026 (2006). If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. *Stoddard,* 395 Md. at 661, 911 A.2d at 1249–50; *Chow,* 393 Md. at 443, 903 A.2d at 395;

*Collins,* 383 Md. at 689, 861 A.2d at 730. If, however, the language is subject to more than one interpretation, it is ambiguous, and we resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose. *Stoddard,* 395 Md. at 662–63, 911 A.2d at 1250; *Blake,* 395 Md. at 224, 909 A.2d at 1026; *Chow,* 393 Md. at 444, 903 A.2d at 395; *Collins,* 383 Md. at 691–92, 861 A.2d at 732.

Additionally, we have narrowly construed any grant of appellate authority. In *State v. Green,* 367 Md. 61, 78, 785 A.2d 1275, 1285 (2001), we overruled our earlier decision in *Cardinell v. State,* 335 Md. 381, 644 A.2d 11 (1994), in which we determined that the State had a common law right to appeal in criminal cases and that the language of Section 12–302(c) of the Courts and Judicial Proceeding Article did not clearly supersede that right. In *Green,* we specifically over-ruled the holding by emphasizing that the State does not enjoy a common law right to appeal an allegedly criminal sentence as "to the extent a common law right to appeal criminal sentences ever existed, the Legislature abrogated that right when it enacted § 12–302(c)." 367 Md. at 76, 785 A.2d at 1283. In so finding, we adopted the reasoning of the dissent of Judge John C. Eldridge in *Cardinell* that "today, there is no common law right to appeal." *Id.* at 72, 785 A.2d at 1281, citing *Cardinell,* 335 Md. at 398–401, 644 A.2d at 19–21 (Judge Eldridge, dissenting).

We have strictly construed the right to appeal in post-*Cardinell* cases. *See Dvorak v. Anne Arundel County Ethics Commission,* 400 Md. 446, 929 A.2d 185 (2007) (holding that neither State nor Anne Arundel County law conferred a right of appeal to the Court of Special Appeals from the order of the circuit court affirming the decision of the Anne Arundel County Ethics Commission); *Fuller v. State,* 397 Md. 372, 918 A.2d 453 (2007) (holding that the denial of an inmate's petition to be committed to a drug treatment program under Section 8–507 of the Health–General Article is not appealable); *Nnoli v. Nnoli,* 389 Md. 315, 884 A.2d 1215 (2005) (holding that the denial of a motion to quash an arrest warrant was not appeal-

able as there was not specific statutory authority granting such an appeal); *Lopez–Sanchez v. State*, 388 Md. 214, 879 A.2d 695 (2005) (holding that victim of a juvenile's delinquent act had no right to appeal the terms of a consent order for restitution as a victim is not a party to a criminal prosecution); *In re Billy W.*, 386 Md. 675, 874 A.2d 423 (2005) (holding that a trial court order from a periodic permanency plan review hearing was not appealable as it was not a final order nor made appealable by Section 12–303 of the Court and Judicial Proceedings Article or any other statute); *State v. Manck*, 385 Md. 581, 870 A.2d 196 (2005) (holding that the State does not have a statutory right to appeal a trial court's striking of notice of intention to seek the death penalty and that this Court could not issue a prerogatory writ to permit appellate review); *Mateen v. Saar*, 376 Md. 385, 829 A.2d 1007 (2003) (holding that the State does not have the right to appeal a sentence under Section 12–302(c)(2) of the Courts and Judicial Proceedings Article when a specific sentence is not mandated by statute); *Pack Shack Inc. v. Howard County*, 371 Md. 243, 808 A.2d 795 (2002) (holding that Howard County had no right to appeal an order denying a civil contempt petition under Section 12–304 of the Courts and Judicial Proceedings Article because the County was not a person adjudged in contempt); *Derry v. State*, 358 Md. 325, 748 A.2d 478 (2000) (dismissing the State's appeal from an order to suppress evidence for a violation of the Maryland Wiretapping and Electronic Surveillance Act because it did not satisfy the terms of the statute). *See also Murrell v. Mayor & City Council of Baltimore*, 376 Md. 170, 829 A.2d 548 (2003) (holding that a circuit court's common law mandamus action was appealable under the general appeals statute as an appeal from such an action was not precluded by Section 12–302(a) of the Courts and Judicial Proceedings Article); *State v. Griswold*, 374 Md. 184, 821 A.2d 430 (2003) (holding that the State had a right to appeal under 12–302(c)(2) of the Courts and Judicial Proceedings Article when a circuit court imposed a sentence specifically prohibited by statute).

A general grant of appellate jurisdiction is provided in Sections 12–301 [10] and 12–308 [11] of the Courts and Judicial Proceedings Article for the review of "final" and "reviewable" judgments. Section 12–302 of the Courts and Judicial Proceedings Article permits a limited number of exceptions to the final judgment rule, one of which is Section 12–302(c)(3) which specifically allows the State to appeal from the grant of a suppression motion under various conditions:

(3)(i) In a case involving a crime of violence as defined in § 14–101 of the Criminal Law Article, and in cases under §§ 5–602 through 5–609 and §§ 5–612 through 5–614 of the Criminal Law Article, the State may appeal from a decision of a trial court that excludes evidence offered by the State or requires the return of property alleged to have been seized in violation of the Constitution of the United States, the Maryland Constitution, or the Maryland Declaration of Rights.

(ii) The appeal shall be made before jeopardy attaches to the defendant. However, in all cases the appeal shall be taken no more than 15 days after the decision has been rendered and shall be diligently prosecuted.

(iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and

---

**10.** Section 12–301 of the Courts and Judicial Proceedings Article Maryland Code (1974, 2006 Repl.Vol.) states:

Except as provided in § 12–302 of this subtitle, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended. In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment.

**11.** Section 12–308 of the Courts and Judicial Proceedings Article Maryland Code (1974, 2006 Repl.Vol.) states:

Except as provided in § 12–307 of this subtitle, the Court of Special Appeals has exclusive initial appellate jurisdiction over any reviewable judgment, decree, order or other action of a circuit court, and an orphans' court.

that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.

(iv) Except in a homicide case, if the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken. In that case, the State may not prosecute the defendant on those specific charges or on any other related charges arising out of the same incident.

Section 12–302(c)(3) does not confer appellate jurisdiction to hear a defendant's cross-appeal. Rather, the statute clearly limits the right to appeal from an interlocutory order to the State; the defendant is free to appeal from the final judgment. The statute also expressly links the State's right to appeal to certain restrictions inapplicable to defendants, such as "[t]he appeal shall be made before jeopardy attaches" and "the State shall certify to the court that the appeal is not taken for purposes of delay."

Where the defendant has been given a specific right to appeal in addition to the right to appeal from final judgments, the Legislature has been specific in protecting that right. For example, Section 12–401 of the Courts and Judicial Proceedings Article, in addressing the right to appeal a decision of the District Court in criminal cases, specifies that:

(b) *Criminal cases.*—In a criminal case:

(1) The *State* may appeal from a final judgment entered in the District Court:

(i) If the State alleges that the trial judge failed to impose the sentence specifically mandated by the Code; or

(ii) Granting a motion to dismiss, or quashing or dismissing a charging document.

(2) The *defendant* may appeal even from a final judgment entered in the District Court though imposition or execution of sentence has been suspended.

(emphasis added).[12] Unlike Section 12–401, which specifically states that "[t]he defendant may appeal," or the language of a "a party may appeal," in Section 12–303 of the Courts and Judicial Proceedings Article,[13] or "[a]ny person may appeal," in Section 12–304 of the Courts and Judicial Proceedings Article,[14] Section 12–302(c) speaks only of the State.

Further, contrary to Rush's contention, Section 12–301 of the Courts and Judicial Proceedings Article and Maryland Rule 8–202(e) do not create any ambiguity. We have held previously that when provisions of Section 12–302 are in conflict with the general grant of appellate jurisdiction provided by Section 12–301, the more specific Section 12–302 provisions will control. In *Gisriel v. Ocean City Board of Supervisors of Elections*, 345 Md. 477, 496, 693 A.2d 757, 767 (1997), we held that an appeal was not authorized under Section 12–301 because it was superseded by the more specific provision of Section 12–302(a) of the Courts and Judicial Proceedings Article, which states that "[u]nless a right to appeal is expressly granted by law, § 12–301 does not permit an appeal

---

**12.** *See also* Section 12–301 of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2006 Repl.Vol.), stating in pertinent part:
> In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended.

**13.** Section 12–303 of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2006 Repl.Vol.), states in pertinent part:
> A *party* may appeal from any of the following interlocutory orders entered by a circuit court in a civil case. . . .
> (emphasis added).

**14.** Section 12–304(a) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2006 Repl.Vol.), states:
> (a) *Scope of review.—Any person* may appeal from any order or judgment passed to preserve the power or vindicate the dignity of the court and adjudging him in contempt of court, including an interlocutory order, remedial in nature, adjudging any person in contempt, whether or not a party to the action.
> (emphasis added).

from a final judgment of a court entered or made in the exercise of appellate jurisdiction in reviewing the decision of the District Court, an administrative agency, or a local legislative body."

Maryland Rule 8–202(e) which states that "[i]f one party files a timely notice of appeal, any other party may file a notice of appeal within ten days after the date on which the first notice of appeal was filed or within any longer time otherwise allowed by this Rule," can also be read with Section 12–302(c) without engendering any conflict or ambiguity, as Rule 8–202 specifically refers to times for filing a notice of appeal and does not grant or limit jurisdiction.

Although Rush could not file a "cross-appeal," she was entitled to raise the voluntariness issue in the State's appeal, in order to defend the suppression ruling on an alternative ground raised by Rush and ruled on by the hearing judge. *See Robeson v. State,* 285 Md. 498, 501–04, 403 A.2d 1221, 1223–24 (1979). The Court of Special Appeals was correct in noting that "a reviewing court may uphold the final judgment of a lower court on any ground adequately shown by the record"; *Rush,* 174 Md.App. at 293, 921 A.2d at 353; although we disagree that the record is adequate upon which to base an appellate determination of voluntariness. In *Frederick v. Pickett,* 392 Md. 411, 433–34, 897 A.2d 228, 241 (2006), we declined to consider lack of *in rem* jurisdiction and bad faith as other grounds for affirming the circuit court's dismissal of a condemnation action because those grounds were not adequately developed in the record. We concluded that

the Circuit Court, although presented with argument concerning *in rem* jurisdiction and bad faith, did not specifically address the contentions. Therefore, because there is a dearth of necessary factual detail in the record regarding these contentions, we will not affirm the Circuit Court's decision on those grounds.

*Id.* at 434, 897 A.2d at 241. *See also Mosley v. State,* 378 Md. 548, 562–65, 836 A.2d 678, 684–88 (2003) (iterating that, in the post-conviction context, ineffective assistance of counsel claims

are best reviewed by a trial court rather than an appellate court); *Myers v. Director of the Patuxent Institution*, 233 Md. 621, 622, 195 A.2d 716, 716–17 (1963) (in post-conviction context, remanding case to hearing judge when adequate findings of fact upon which appellate court could base its decision were absent).

 The Court of Special Appeals concluded that the record was adequate for it to rule on the issue of involuntariness, in a decision directly opposite to that of the trial court, based upon its review of the transcript of Detective Jernigan's interview of Rush and reflected that her inculpatory statements were obtained through inducements. *Rush*, 174 Md. App. at 301–13, 921 A.2d at 358–65. We decline to follow the same path because inferences drawn from viewing the interview DVD, through observation of the inflictions and demeanor exhibited by both Rush and Detective Jernigan, may differ from those inferences that can be drawn from the bare transcript. We are left with a record that is not adequate to base a decision.[15]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED AS TO *MIRANDA* ISSUE AND REVERSED AS TO VOLUNTARINESS ISSUE; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO DISMISS APPEAL OF PETITIONER RUSH, REVERSE SUPPRESSION ORDER OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, AND REMAND TO THAT COURT FOR FURTHER PROCEEDINGS; COSTS IN THE COURT OF SPECIAL APPEALS AND THIS COURT TO BE PAID BY PETITIONER.**

RAKER, J., concurs and dissents.

BELL, C.J., and GREENE, J, dissent.

---

**15.** It would be advisable for a trial judge in a similar situation to rule specifically on each ground presented in a motion to suppress.

RAKER, J., concurring and dissenting:

I join in Part II. A. of the opinion of the Court affirming the holding of the Court of Special Appeals that the Circuit Court erred in ruling that Rush was not sufficiently advised of her rights in accordance with *Miranda*, and in granting the motion to suppress her inculpatory statements on that ground. In other words, the *Miranda* warnings were constitutionally adequate.

I dissent from the majority's ruling on the involuntariness issue. I agree with the State that Rush cannot appeal the Circuit Court's finding that portions of her statement were voluntary. The ruling was interlocutory, and because there exists no statute or right to appeal such an order, her claim may be raised in an appeal from a final judgment, and not within the State's appeal.

BELL, C.J., dissenting, in which GREENE, J. joins.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court of the United States considered "the admissibility of statements obtained from an individual who is subjected to custodial police interrogation and the necessity for procedures which accure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself," *id.* at 439, 86 S.Ct. at 1609, in the process seeking "to give concrete constitutional guidelines for law enforcement agencies and courts to follow." *Id.* at 442, 86 S.Ct. at 1611. Addressing the concrete constitutional guidelines it intended to provide, it held:

> "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated bylaw enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.... As for the

procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made *voluntarily, knowingly and intelligently*. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."

*Id.* at 444–445, 86 S.Ct. at 1612 (emphasis added). These guidelines were necessary because the Court

"concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."

*Id.* at 467, 86 S.Ct. at 1624.

Having identified the rights of which a custodial defendant must be apprised, the Court explained the rationale underlying each:

"At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it-the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. It is not just the subnormal or woefully ignorant who succumb to an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained or that silence in the face of accusation is itself damning and will bode ill when presented to a jury.... Further, the warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it.

 * * * * * *

"The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; ... a warning is a clear cut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.

"The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of

the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system-that he is not in the presence of persons acting solely in his interest.

"The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. A mere warning given by the interrogators is not alone sufficient to accomplish that end. Prosecutors themselves claim that the admonishment of the right to remain silent without more 'will benefit only the recidivist and the professional.' Brief for the National District Attorneys Association as amicus curiae, p. 14. Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. *Cf. Escobedo v. State of Illinois,* 378 U.S. 478, 485, n. 5, 84 S.Ct. 1758, 1762[, 12 L.Ed.2d 977 (1964) ]. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.

"The presence of counsel at the interrogation may serve several significant subsidiary functions as well. If the accused decides to talk to his interrogators, the assistance of counsel can mitigate the dangers of untrustworthiness. With a lawyer present the likelihood that the police will practice coercion is reduced, and if coercion is nevertheless exercised the lawyer can testify to it in court. The presence of a lawyer can also help to guarantee that the accused gives a fully accurate statement to the police and that the

statement is rightly reported by the prosecution at trial. *See Crooker v. State of California,* 357 U.S. 433, 443–448, 78 S.Ct. 1287, 1293–1296, 2 L.Ed.2d 1448 (1958) (Douglas, J., dissenting)."

*Miranda,* 384 U.S. at 467–70, 86 S.Ct. at 1624–26. But, the Court concluded, the advice of the right to counsel *generally* does not suffice, the defendant's ability to afford counsel must be considered. It explained:

"In order fully to apprise a person interrogated of the extent of his rights . . ., it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent-the person most often subjected to interrogation-the knowledge that he too has a right to have counsel present. As with the warning of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it."

*Id.* at 473, 86 S.Ct. at 1628 (footnotes omitted).

The importance of, indeed, the necessity for, the requirement that a defendant be informed explicitly of his or her right to have counsel present both before and during questioning was underscored by the Court and made manifest when it admonished that "[n]o amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right." *Id.* at 471–72, 86 S.Ct. at 1626. Similarly, with regard to the indigent defendant, the Court was clear and unequivocal:

"[t]he financial ability of the individual has no relationship to the scope of the rights involved here. The privilege against self-incrimination secured by the Constitution applies to all individuals. The need for counsel in order to protect the privilege exists for the indigent as well as the affluent. In fact, were we to limit these constitutional rights to those who can retain an attorney, our decisions today would be of little significance."

*Id.* at 472, 86 S.Ct. at 1626–27.

The majority holds today that the *Miranda* warnings given the petitioner in this case satisfies the *Miranda* requirements here in before reviewed.[1] *Rush v. State*, 403 Md. 68, 89-90, 939 A.2d 689, 702 (2007). I do not, and cannot, agree.

---

1. As relevant, the interrogation proceeded:
"DETECTIVE JERNIGAN: All right. Well, let's get the formalities out of the way.
"RUSH: Okay.
"DETECTIVE JERNIGAN: Need anything to drink or anything or—
"RUSH: No. I'm okay.
"DETECTIVE JERNIGAN: Okay.
"RUSH: Actually, I was wonderin', I don't know why I'm even here. The detective, police showed up at my door and arrested me, said I had a warrant.
"DETECTIVE JERNIGAN: Okay. Cindi, how far'd ya get in school?
"RUSH: Ninth grade.
"DETECTIVE JERNIGAN: Do you know how to read?
"RUSH: Yeah, I've taken GED classes and I just haven't been able to go take the test. I'm very (unintelligible). I have my CNA license and everything.
"DETECTIVE JERNIGAN: Okay. All right. Just to prove to me that you know how to read—
"RUSH: Mm-hmm.
"DETECTIVE JERNIGAN:—I'm going to let you read a portion of this statement for me, okay?
"RUSH: Okay.
"DETECTIVE JERNIGAN: Can you move that chair on up? Read this first sentence—
"RUSH: Mm-hmm.
"DETECTIVE JERNIGAN:—on the top line for me.
"RUSH: 'I am now going to read to you your rights under the law.'
"DETECTIVE JERNIGAN: Very good. All right. I'm gonna read the rest to you out loud and then we'll go over it together, okay?
"RUSH: Okay.
"DETECTIVE JERNIGAN: 'I'm now going to read you your rights under the law. If you do not understand something that I say to you, please stop me and I will explain it to you. You have the right to

Rather than being read the Advice of Rights and Waiver Form, the petitioner was given warnings that were modified by the interrogating detective. As modified, the warnings given advised that if the petitioner wanted a lawyer and could not afford to hire one, counsel would be provided her at no cost, "at some time." The latter phrase was added by the detective. In addition, rather than informing the petitioner in accordance with the last sentence of the Form, which acknowledged the petitioner's right to elect to proceed with questioning without counsel, the detective amended the sentence to omit any reference to the petitioner's right of election.[2] By blessing these modifications, the majority undermines a key purpose of *Miranda*, jealously to protect a defendant's Fifth Amendment rights by making clear to a suspect in custody "that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him *prior to any interrogation*." *Miranda*, 384 U.S. at 474, 86 S.Ct. at 1628 (emphasis added). The advisements in this case are far from clear. To

remain silent. If you choose to give up this right, anything that you say can be used against you in court. You have the right to talk to a lawyer before you're asked any questions. You have the right, you, you have the right to have a lawyer with you while being questioned. If you want a lawyer and can't afford one, one will be provided to you at some time at no cost. If at some point in time during our questioning you decide you don't wanna talk anymore, that's your right as well.' Okay?

A short time later, Rush signed an Advice of Rights and Waiver Form, the contents of which, though similar, differed from the Detective's oral advisements in significant ways. Instead of 'If at some point in time during our questioning you decide you don't wanna talk anymore, that's your right as well,' the last sentence of the Form reads 'If you want to answer questions now without a lawyer, you still have the right to stop answering questions at any time.' The Form, which was typed, included a handwritten insertion of the phrase "@ some time[.]"

**2.** That sentence read: "If you want to answer questions now without a lawyer, you still have the right to stop answering questions at any time." As phrased by the detective, it informed the petitioner, "[i]f at some point in time during our questioning you decide you don't wanna talk anymore, that's your right as well," in effect assuming that the questioning without counsel would proceed.

the contrary, the message that they convey is, at best, ambiguous and, at worst, confusing. This is particularly the case when it is considered that the "at some time" qualifier applies only to appointed counsel; it does not, and the majority does not suggest that it does, apply to hired counsel. The message is also ambiguous with respect to whether appointed counsel can be present during questioning. While there is no explicit statement that appointed counsel, too, must be present at and during questioning, there is a suggestion that the opposite is the case: the advisements assumed, and conveyed to the petitioner, the expectation that questioning would occur, subject to termination later, when it did not recognize what must be obvious if the spirit and meaning of *Miranda* are to be respected, that for the questioning to proceed, the petitioner must have waived the right to counsel's presence. And that waiver, *Miranda* requires to b e "voluntarily, knowingly and intelligently" made, an impossibility unless the options are clear and unambiguous. In that regard, the inclusion of the words, "at some time," even if to explain the system or protocol for the appointment of counsel for indigents, is significant. That reference may, and indeed is likely to, lead an indigent defendant to believe, and not unreasonably so, that he or she is not entitled to an appointed attorney during the impending questioning, but, instead, counsel will be appointed for him or her only "at some time" in the future. These ambiguities had so muddied the advisements given, no waiver given, or taken, under these circumstances could ever be knowing, intelligent, or voluntary.

Acknowledging that the goal of its review of the advisements given is to determine whether the petitioner's rights under *Miranda* were adequately preserved, the majority purports to have "[a]ssess[ed] the totality of the advisements, both oral and written," for that purpose. *Rush,* 403 Md. at 90, 939 A.2d at 702. In fact, "[i]n lawyerlike fashion," the majority "parses" the advisements, looking for an interpretation that plausibly could be consistent with *Miranda. Duckworth v. Eagan,* 492 U.S. 195, 216, 109 S.Ct. 2875, 2887, 106 L.Ed.2d 166 (1989) (Marshall, J., dissenting). Having noted that "Rush

was told that she could speak with a lawyer before being questioned and at any time during questioning[,]" and concluding that the "modification of the advisements did not tie her right to counsel to a future event or to her ability to obtain a lawyer herself; rather, as in *Duckworth*, the modified language only clarified, in a separate advisement, how and when appointed counsel would be provided," *Rush*, 403 Md. at 90, 939 A.2d at 702, the majority is satisfied that, as in *Duckworth*, the advisements "touched all of the bases required by *Miranda*," 492 U.S. at 203, 109 S.Ct. at 2880, and "reasonably conve[yed] to [the petitioner her] rights as required by *Miranda*." *Id.* (quoting *California v. Prysock*, 453 U.S. 355, 361, 101 S.Ct. 2806, 2810, 69 L.Ed.2d 696 (1981)). It thus announces that "the modified language does not suggest . . . that appointed counsel could not be present during questioning." *Rush*, 403 Md. at 90, 939 A.2d at 702.

The majority is right, of course, its interpretation of the advisements is a plausible one all of the requirements were mentioned and, thus, all the bases were touched. It cannot be disputed that, superficially and technically, Rush was told she could speak with a lawyer before and during questioning. The trouble with the majority's analysis is that the question it answers is the wrong one. It is not the question whether all of the requirements were mentioned or whether one interpretation is to be preferred over another; rather, the question is whether the advice given was sufficiently clear and unambiguous as to enable the defendant, voluntarily, knowingly, and intelligently, to waive her *Miranda* rights. It is important to consider the advisements both in toto and in context. In that regard, it is significant that, immediately after being told of the right to have counsel before and during questioning, the petitioner was told that if she could not afford a lawyer, she would be appointed one "at some time," not prior to the commencement of questioning. The petitioner could have, and probably did, glean from the "at some time" qualification that only those able to afford a private attorney would be entitled to seek counsel during questioning, and accordingly, those

unable to afford an attorney would have to wait until a later period in time. *See Duckworth,* 492 U.S. at 216–17, 109 S.Ct. at 2887, in which Marshall, J., dissenting, observed, in language remarkably applicable to the case *sub judice:*

> "What goes wholly overlooked in [the majority's] analysis is that the recipients of police warnings are often frightened suspects unlettered in the law, not lawyers or judges or others schooled in interpreting legal or semantic nuance. Such suspects can hardly be expected to interpret, in as facile a manner as [the majority], the pretzel-like warnings here-intertwining, contradictory, and ambiguous as they are."

(quoting *Commonwealth v. Johnson,* 484 Pa. 349, 399 A.2d 111, 115 (1979).) Just as important, the petitioner was told of her right to terminate questioning once it was begun, but not that the commencement of questioning without counsel had to be with her consent to proceed in that fashion.

*Miranda* mandates that, before an accused may be subjected to custodial interrogation, he or she must be "adequately and effectively apprised of his [or her] rights against self-incrimination," 384 U.S. at 467, 86 S.Ct. at 1624, which includes being informed explicitly of his or her right to have counsel present both before and during questioning. *Id.* at 473, 86 S.Ct. at 1628. The warnings in this case do not pass muster. If "[n]o amount of circumstantial evidence that the person may have been aware of this right [to counsel, appointed, if appropriate, during and before custodial questioning] will suffice to stand in its stead," it follows that no amount of parsing to find a plausible interpretation of an ambiguous advisement will save that advisement. *Id.* at 471–72, 86 S.Ct. at 1626. When the advisement is ambiguous, there can be no voluntary, knowing, and intelligent waiver. Only an explicit, clear warning provides the "ascertainable assurance that the accused was aware of this right." *Id.* at 471–72, 86 S.Ct at 1626. What the Supreme Court iterated over forty years ago bears repeating and remembering:

> "[t]he warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the

person most often subjected to interrogation-the knowledge that he too has a right to have counsel present. . . . [O]nly by *effective and express explanation to the indigent* of this right can there be assurance that he was truly in a position to exercise it."

*Miranda,* 384 U.S. 436, 473, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (emphasis added).

I dissent. Judge Greene joins in the views expressed herein.